Mary K. SUTTON, Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 1–485 A 98.

Court of Appeals of Indiana,
First District.

July 24, 1986.

Rehearing Denied Sept. 8, 1986.

Peter Campbell King, Cline, King, Beck & Harrison, Dennis M. Stark, Columbus, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Office of Attorney General, Indianapolis, for plaintiff-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Appellant, Mary Kay Sutton, appeals from her conviction for Conspiracy to Commit Murder[1] entered by the Bartholomew Circuit Court following a jury trial. We affirm.

## FACTS

The facts most favorable to the trial court's judgment are as follows. Gary Asher and Cheryl Britton were married in 1982. They subsequently instituted divorce proceedings. On November 23, 1983, Asher and Britton were involved in a violent altercation during which Asher threatened to kill Britton. Criminal charges were later filed against Asher as result of this incident. Both Asher and his mother, Mary Kay Sutton, contacted Britton in attempts to persuade her not to persist in pressing the charges. Britton rebuffed these pleas.

On Thursday, February 23, 1984, Sutton visited Charlie Brown's, a Columbus, Indiana, tavern. There she met an old acquaintance, Paul Hignite. He was unemployed and gambling for a living at Charlie Brown's. Sutton asked Hignite if he was interested in earning some money. When Hignite asked what the work consisted of, Sutton told him she had to pick up her younger son but that she would meet Hignite back at Charlie Brown's around 5:00 p.m.

At approximately 5:00 p.m., Sutton returned to Charlie Brown's with her son, Asher. She subsequently introduced Asher to Hignite. Asher asked Hignite what he was willing to do for money. Hignite replied, "If the money's right, there's nothing short of murder." Record at 852. Asher told him that that was precisely what they were interested in. Asher and Sutton then explained the situation which had developed with Asher's estranged wife, Britton. The parties discussed various

---

**1.** Indiana Code section 35–42–1–1 (Burns 1985) states:

"A person who:
(1) Knowingly or intentionally kills another human being; or
(2) Kills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery; commits murder, a felony."

Indiana Code section 35–41–5–2 (Burns 1985) provides:

"(a) A person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony. A conspiracy to commit a felony is a felony of the same class as the underlying felony. However, a conspiracy to commit murder is a class A felony.

(b) The state must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement.

(c) It is no defense that the person with whom the accused person is alleged to have conspired:
(1) Has not been prosecuted;
(2) Has not been convicted;
(3) Has been acquitted;
(4) Has been convicted of a different crime;
(5) Cannot be prosecuted for any reason; or
(6) Lacked the capacity to commit the crime."

methods of doing-away with Britton and the cost of performing such a service. Hignite also informed Asher and Sutton that he could contact a "hit man" from Florida. At the conclusion of their discussion, all agreed that they would meet again at noon on February 25, 1984.

The following day, Friday, February 24, 1984, Hignite, who frequently had worked as a professional informant in the past, contacted the Indiana State Police. He informed Charles Jerrell, an undercover ISP officer, of his conversations with Asher and Sutton. After discussing the situation, Officer Jerrell told Hignite to pursue it and meet with Asher and Sutton again.

As previously arranged, Hignite, Asher and Sutton met on Saturday, February 25, 1984. Once again, the parties discussed how Britton would be killed and how much Asher and Sutton would have to pay. Asher also gave Hignite a description of the car Britton was driving and its license number; Hignite also requested a photograph of Britton to facilitate the "hit man's" job.

Following this meeting, Officer Jerrell instructed Hignite to arrange another meeting with Asher and Sutton so that Jerrell could be introduced as the "hit man" from Florida. Early the next week, Hignite phoned Sutton and told her that he had contacted the "hit man" and he was on his way from Florida. During this conversation, Sutton informed Hignite that she had a photograph of Britton and the gun which was to serve as part of the down payment for the "hit."

On March 7, 1984, after several telephone conversations with Asher and Sutton, Hignite set up another meeting. The following day, March 8, 1984, Hignite met with Asher. It was at this meeting that Officer Jerrell was introduced to Asher as "The Butcher", the Floridian "hit man". Officer Jerrell and Asher proceeded to discuss Britton's schedule and the best time to commit the murder. They also discussed the method of payment. Finally, they agreed to meet later in the day, at which time Asher would provide Officer Jerrell with $500 and a hand gun, which represent-

ed the down payment, and a photograph of Britton.

Later on March 8, 1984, Asher, Sutton, Hignite, and Officer Jerrell met at the home of one of Hignite's friends. In Officer Jerrell's presence, Sutton handed Hignite the picture of Britton which had been requested. Asher and Officer Jerrell went outside where Asher gave him $500 in cash and a hand gun as agreed. Then, as the parties were preparing to leave, Officer Jerrell informed them that he would do it Saturday night. Neither Asher nor Sutton objected.

On March 12, 1984, Asher and Sutton were arrested and charged with Conspiracy to Commit Murder. They were tried together and the jury returned guilty verdicts against both. Sutton was subsequently sentenced to 20 years imprisonment with all but 10 years of that sentence suspended. She then perfected this appeal.

## ISSUES

1. Whether there was sufficient evidence presented at trial from which the jury could properly find Sutton guilty of Conspiracy to Commit Murder.

2. Whether the trial court erred when it denied Sutton's motion *in limine* which sought to exclude statements of her co-defendant, Asher, until such time as the conspiracy was proved by independent evidence.

3. Whether the trial court erred in overruling Sutton's motions for mistrial based on the following acts by the prosecutor:

A. Prosecutor's reference, during opening arguments, to statements of Sutton's co-defendant.

B. Prosecutor's reference, during opening arguments, to certain tape recordings.

C. Prosecutor's misstatement, during closing arguments, of the state of the law concerning the use of expert testimony based on hypnosis.

D. Prosecutor's act, during trial, of twice placing transcripts of suppressed tape recordings within the jury's view.

4. Whether the trial court erred when it gave State's Final Instruction No. 1 regarding the criminal liability of one who joins an existing conspiracy.

5. Whether the trial court erred when it refused to give Sutton's tendered Final Instructions 3, 5, 8, 9 and 10.

6. Whether the trial court imposed a manifestly unreasonable sentence.

## DISCUSSION AND DECISION

*Issue One*

We initially address Sutton's arguments that there was insufficient evidence to support her conviction for conspiracy to commit murder. When presented with such an argument, this court will neither reweigh the evidence nor judge the credibility of the witnesses who provided it. Rather, we will look only to the evidence most favorable to the trial court's judgment and the reasonable inferences which can be drawn from that evidence. If, from this view, there is substantial evidence of probative value to support the conclusion of the trier of fact, that conclusion will not be disturbed. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 84, *cert. denied,* — U.S. —, 106 S.Ct. 1241, 89 L.Ed.2d 349.

In a prosecution for conspiracy to commit murder, the state must prove, beyond a reasonable doubt, that the defendant had the intent to commit murder, agreed with another person to commit murder, and that some overt act was performed in furtherance of that agreement. *Williams v. State* (1980), 274 Ind. 94, 95, 409 N.E.2d 571, 573; Ind. Code § 35–41–5–2. The gravamen of the offense, however, is the agreement. Sutton's argument specifically challenges the evidence of an agreement between her and her alleged co-conspirator, Officer Jerrell.

A conspiracy entails an intelligent and deliberate agreement between the parties. *Survance v. State* (1984), Ind., 465 N.E.2d 1076, 1080. But the state is not required to prove the existence of a formal express agreement. *Abner v. State* (1985),

Ind., 479 N.E.2d 1254, 1258; *Survance,* at 1080; *Williams,* 274 Ind. at 96, 409 N.E.2d at 573; *Ridgeway v. State* (1981), Ind.App., 422 N.E.2d 410, 415. "It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense ...." *Williams,* 274 Ind. at 96, 409 N.E.2d at 573. This may be inferred from the acts committed and the circumstances surrounding the defendant's involvement. *Survance,* at 1080–81; *Reese v. State* (1983), Ind., 452 N.E.2d 936, 941; *Abner,* at 1258; *Williams,* 274 Ind. at 96, 409 N.E.2d at 573. Understandably then, a conviction for conspiracy may, and often will, rest solely on circumstantial evidence. *Williams,* at 96, 409 N.E.2d at 573.

As our report of the facts indicates, there was substantial evidence presented at trial establishing that Sutton agreed with Officer Jerrell to murder Britton. The state's evidence showed that Sutton made the original contact with Hignite for the purpose of arranging her daughter-in-law's murder. She then attended and took an active part in several meetings where the murder of Britton and the hiring of a "hit man" to do it were discussed. In addition, she was present at the final, pre-arranged meeting with the "hit man". As requested, she provided Hignite with a photograph of Britton, which the "hit man" needed to identify the intended victim. She was also present when, at the conclusion of this final meeting, the "hit man" informed the conspirators that Britton would be killed the following Saturday night. Sutton voiced no objections. We certainly agree with Sutton that evidence of mere association with other members of the conspiracy is, in and of itself, insufficient to support a conviction for conspiracy. *Williams,* at 96, 409 N.E.2d at 573; *Scott v. State* (1958), 238 Ind. 667, 672, 154 N.E.2d 107, 109. However, there clearly was sufficient additional evidence from which the jury could have reasonably concluded that she conspired with Officer Jerrell to murder Britton. The fact that she never actually spoke to him does not change that conclusion.

This case hinged largely upon whether the jury believed the defendants' testimony or the testimony offered by the state's witnesses, particularly that elicited from Hignite. Although we might have weighed the evidence differently, that is not our function. Resolution of conflicts arising from the testimony offered at trial is exclusively within the province of the trier of fact. *See Bieghler*, at 85. Sutton's briefs essentially enjoin us to ignore this long-standing principle and adopt her interpretation of the evidence adduced at trial. This we may not do.

*Issue Two*

 Sutton next challenges the admission of certain statements made by Asher.[2] As we noted above, Asher was involved in a violent altercation with Britton on November 23, 1983, during which Asher made various statements threatening future harm to Britton. Although somewhat convoluted, Sutton appears to raise three distinct arguments in support of her proposition of error. First, she asserts that Asher's statements did not meet the requirements of admissibility set out in *Patton v. State* (1961), 241 Ind. 645, 175 N.E.2d 11, in that the statements where made long before the conspiracy charge was formed. Sutton also contends that these statements were not properly admissible to prove intent, purpose, motive, identity, or common scheme or plan. *See Montgomery v. State* (1980), 274 Ind. 544, 547, 412 N.E.2d 793, 795. Finally, Sutton appears to argue that the state failed to show the existence of a conspiracy involving Sutton by independent evidence before the statements of Asher were introduced. *See Patton*, 241 Ind. at 648, 175 N.E.2d at 12–13. *But see also Beal v. State* (1983), Ind., 453 N.E.2d 190, 195. Each of these arguments fails to take into account an important event however.

Contemporaneous with the admission of Asher's statements, the trial court extensively admonished the jury as to their proper import. The court stated:

"Ladies and gentlemen of the jury, uh, there will be a time after all the evidence is in when, as I mentioned earlier on, that you'll be fully instructed upon all the points of law which apply to this case. Uh, you will find, as you probably have already surmised that, uh conspiracy presents particular problems with respent—with respect to proof and the order of proof, and particularly in the State of Indiana, uh, you'll find that there is law to such an extent that since conspiracy is considered like an agency, uh, the statement of one is imputed to the other. I'm giving you instruction now that anything this officer says with respect that [sic] Mr. Asher may have said, again you're to weigh that, as your role as jurors, at this particular time cannot be imputed or used against Mrs. Sutton, in this matter. Uh, I have determined as of a matter of law that any conspiracy which allegedly was formed could not conceivably have been formed until sometime in the latter part of February. Uh, this, this, these statements which will be coming in again, you are to weigh and consider but only as to the guilt or innocence of the defendant, Gary Asher, not as to Mrs. Sutton, so you had that limiting instruction."

Record at 795–96. In addition, the trial court included a similar admonition in its final instructions. Therefore, if any error occurred in the admission of Asher's statements, Sutton has failed to demonstrate that she was prejudiced thereby.

A recent case from our supreme court dealt with a very similar situation. In *Beal v. State* (1983), Ind., 453 N.E.2d 190, the trial court permitted a witness in a conspiracy prosecution to testify that appellant's co-defendant had threatened her not to testify. However, the trial court also admonished the jury that this evidence could not be used in determining the appellant's guilt or innocence. The trial court reinforced

---

2. Sutton raises these arguments in two portions of her brief. Initially, she generally challenges the admission of Asher's statements during trial. She also argues later in her brief that the trial court erred in overruling her motion in limine which also sought to exclude the statements made by Asher. We see no reason to discuss separately these claimed errors.

this admonition in its final instructions to the jury. Our supreme court held that: "Since the evidence of witness intimidation was directed against [appellant's co-defendant] only and since the trial court carefully admonished and instructed the jury that said evidence had no reference to Appellant and was not to be used against him, we do not find Appellant prejudiced. We therefore find no reversible error on this issue."

*Beal,* at 194. We must agree. Sutton has not established reversible error.

*Issue Three*

 Sutton next alleges that the trial court erred in overruling her various motions for mistrial. The granting of a motion for mistrial lies within the sound discretion of the trial court. *Pillow v. State* (1985), Ind., 479 N.E.2d 1301, 1306; *Bradford v. State* (1983), Ind., 453 N.E.2d 250, 252; *Ramos v. State* (1982), Ind., 433 N.E.2d 757, 759; *Morgan v. State* (1981), 275 Ind. 666, 671, 419 N.E.2d 964, 967. We will reverse only where the defendant demonstrates that he was placed in a position of grave peril to which he should not have been subjected. *Pillow,* at 1306; *Bradford,* at 252; *Morgan,* 275 Ind. at 671, 419 N.E.2d at 967. A mistrial is the remedy of last resort. It is warranted only when no other curative action will sufficiently rectify the alleged error. *Bradford,* at 252. Furthermore, when the jury is properly admonished to disregard the alleged misconduct, or if other reasonable corrective action is taken, generally no reversible error will be found. *Pillow,* at 1306; *Ramos,* at 759. Applying these standards to the present case, we conclude that Sutton has failed to establish that the trial court committed reversible error when it denied each of her motions for mistrial.

 Sutton first claims that the prosecutor engaged in misconduct when, during his opening statements, he referred to the threats of future harm Asher made to Britton during the November 23, 1983, altercation. However, she did not object to these statements when they were made. She has, therefore, waived any error which may have been engendered by it. *Murray v. State* (1985), Ind., 479 N.E.2d 1283, 1287; *Follrad v. State* (1983), Ind., 451 N.E.2d 635, 637. In any event, the prosecutor made only general reference to threats made by Asher. Clearly Sutton was not placed in a position of grave peril to which she should not have been subjected. Thus, even if Sutton had properly preserved this question, we would find no error in the trial court's denial of a motion for mistrial on these grounds.

 Next, Sutton contends that the prosecutor engaged in misconduct, requiring a mistrial, when he mentioned the existence of certain tapes during his opening statements to the jury. The trial court had, prior to trial, preliminarily ruled that some of these tapes would be suppressed because they were largely inaudible. Once again, however, Sutton did not make a timely objection to these remarks. Instead, she waited until the conclusion of the state's opening statement. Any error was, therefore, waived. *Pounds v. State* (1983), Ind., 443 N.E.2d 1193, 1195. Besides, the prosecutor made only a brief reference to the existence of tape recordings made by the police during their investigation. He did not reveal whose voices were on the tapes or what was said. In addition, the trial court had not ruled that all tapes would be suppressed. It appears, rather, that the ultimate decision on the admissibility of the tapes would be made during the trial. Finally, the trial court promptly admonished the jury to completely disregard the existence of any tapes for the time being. The trial court informed the jury that:

"Ladies and gentlemen of the jury, with respect to certain comments made by the prosecutor as to tapes this Court has suppressed, you're to disregard those comments as if, in fact, they were not said. Further, you are to disregard any reference or erase from your mind, uh, the thought of any tapes which the Court has declared to be inaudible. Under the present state of law, uh, I have made a

determination that certain items are suppressable and have been suppressed because of their inaudibility, uh, for the feeling that what that does, it subjects everybody to guess as opposed to what in fact, did or did not happen. So with respect to those matters, they are suppressed and ... please disregard those comments by the prosecutor."

Record at 549–50. Under these circumstances, the trial court would have committed no error in refusing Sutton's request for a mistrial.

█ The third alleged erroneous denial of a motion for mistrial stems from an incident which occurred during the prosecutor's closing arguments. His comments to the jury included an arguably incorrect statement of the law. An objection was interjected immediately.[3] A curative instruction was requested and given. No other remedy was sought. Consequently, the trial court could not have erred by not ordering a mistrial. *See Barker v. State* (1982), Ind., 440 N.E.2d 664, 669 (holding that failure to request an admonition waives any error resulting from a failure to admonish the jury).

█ Finally, Sutton argues that she was entitled to a mistrial because the prosecutor twice placed the transcripts of certain suppressed tape recordings within the jury's view. On neither occasion, however, did Sutton specifically object to the prosecutor's admittedly unintentional conduct. Rather, she merely requested that the transcripts be moved. This was done on both occasions. Since she requested no other relief, she cannot now argue that the trial court should have granted her a mistrial on this basis. *See Barker,* at 669. The trial court committed no reversible error in denying Sutton's various motions for mistrial.

---

**3.** Actually, only Asher objected to the prosecutor's remarks. Sutton's counsel offered no objection of his own.

**4.** Although this bracketed portion of the instruction appears in Sutton's quotation of State's Final Instruction No. 1, it is neither present in the

*Issue Four*

Sutton also asserts that the trial court erred when it gave State's Final Instruction No. 1. That instruction stated:

"An agreement may be implied from the conduct of the parties although they acted separately or by different means and did not come together or enter into an express agreement.

"Ea[ch] party to a conspiracy [is responsible for all acts performed by his co-conspirator][4] in furtherance of the conspiracy. (One who knowingly joins an existing conspiracy has the same responsibility as the original parties to the conspiracy.)

"To constitute the crime of conspiracy, it is not necessary that the conspirators succeed in committing the felony."

Record at 318. Sutton objected to this instruction at trial as follows:

"I object to instruction # 1 submitted by the State for the reason that in the next to last paragraph it has in parenthesis (one who knowingly joins an existing conspiracy has the same responsibility as the original parties to the conspiracy) [.] That is taken out of context. It is highlighted and uh it makes this instruction uh uh inflammatory to the jury. It is also covered and uh I think it's a bad instruction."

Record at 1819. On appeal, Sutton has also asserted additional grounds to support her objection to the state's instruction.

We need not address the substantive arguments put forth by Sutton in her appellate brief. In the first instance, Sutton cites no authority and makes no argument supporting the particular objection she raised at trial. Consequently, this argument has been waived. *Lenard v. Adams* (1981), Ind.App., 425 N.E.2d 211, 218; *Summerlot v. Summerlot* (1980), Ind. App., 408 N.E.2d 820, 827; Indiana Rules

copy of the tendered instruction contained in the record nor did the trial court include it when the remainder of the instruction was read to the jury. However, its presence or absence is of no consequence since it is not relevant to any of the objections raised by Sutton.

of Procedure, Appellate Rule 8.3(A)(7). Furthermore, we will not consider the additional arguments Sutton has raised for the first time an appeal. *Joy v. State* (1984), Ind.App., 460 N.E.2d 551, 559. Thus, Sutton has waived any error attendant the giving of this instruction.

*Issue Five*

■ Sutton next challenges the trial court's refusal of several of her tendered instructions. Her counsel, however, did not sign each instruction. Rather, he submitted the tendered instructions under a cover which he signed. Any error occasioned by the trial court's refusal of these instructions has, therefore, been waived.

At the time Sutton's trial occurred, the statutory provision in effect required that:

"(6) If the prosecuting attorney, the defendant, or his counsel desires special instructions to be given to the jury, these instructions must be:

(A) Reduced to writing;

(B) Numbered;

(C) *Signed by the party, or his attorney, who is requesting the special instructions;* and

(D) Delivered to the court;

before the commencement of the argument. A charge of the court or any special instructions, when written and given by the court under this subdivision, may not be orally qualified, modified, or in any manner orally explained to the jury by the court."

Indiana Code section 35–37–2–2(6) (Burns 1985). Our supreme court has held that a signed cover sheet attached to the tendered instructions is not a signing of the instruc-

tions as required by this version of the statute.[5] *Harding v. State* (1984), Ind., 457 N.E.2d 1098, 1101, *cert. denied,* —— U.S. ——, 106 S.Ct. 1218, 89 L.Ed.2d 329. Thus, Sutton has waived any error in this regard.

*Issue Six*

■ Finally, Sutton contends that the sentence imposed upon her by the trial court was manifestly unreasonable. As Sutton is well aware, this court will not revise a sentence unless it is shown to be manifestly unreasonable. *Sandlin v. State* (1984), Ind., 461 N.E.2d 1116, 1119; *Jones v. State* (1983), Ind., 456 N.E.2d 1025, 1030; *Lane v. State* (1983), Ind., 451 N.E.2d 659, 661. A sentence is manifestly unreasonable only where, considering the circumstances of the offense and the character of the offender, no reasonable person could agree with the sentence. *Jones,* at 1030.

■ The jury found Sutton guilty of Conspiracy to Commit Murder, a class A felony. As such, the presumptive sentence was 30 years, with not more than 20 years added for aggravating circumstances or not more than 10 years subtracted for mitigating circumstances. Indiana Code section 35–50–2–4 (Burns 1985). Sutton received the minimum sentence possible, 20 years. All but 10 years of that sentence was suspended. In explaining this sentence, the trial court stated:

"Uh, in reviewing the evidence which was brought forth at the trial and at the sentencing hearing, I think the Court feels safe in concluding that the crimes

---

**5.** Sutton attempts to argue that a signed cover sheet is sufficient. This argument is based on the version of the statute which became effective in 1985 however. That version states:

"(6) If the prosecuting attorney, the defendant, or the defendant's counsel desires special instructions to be given to the jury, these instructions must be:

(A) Reduced to writing;

(B) Numbered;

(C) *Accompanied by an affixed cover sheet that refers to the instructions by number and that is signed by the party, or his attorney, who is requesting the special instructions;* and

(D) Delivered to the court;

before the commencement of the argument. A charge of the court or any special instructions, when written and given by the court under this subdivision, may not be orally qualified, modified, or in any manner orally explained to the jury by the court. If final instructions are submitted to the jury in written form after having been read by the court, no indication of the party or parties tendering any of the instructions may appear on any instruction."

Ind. Code § 35–37–2–2(6) (Burns Supp.1986).

for which the defendants were convicted and the defendant's history are without a doubt inconsistent. Mrs. Sutton and Mr. Asher have lived a productive and law abiding lives. Uh, and such a behavior, or past behavior would not suggest the actions taken by them in February and March of 1984. Uh, yet their lives and their behavior did begin to substantially change in November of 1983. There is no doubt that the criminal charges lodged against Mr. Asher by virtue of the incident with his ex-wife Cheryl, during the Thanksgiving Holiday consumed Mrs. Sutton and Mr. Asher's thoughts from that particular point on. I think such obsession if you will to a certain extent is understandable on behalf of the defendants. For Mr. Asher, the thoughts of the charges and their effects upon his pending divorce with Cheryl obviously justified some periodic irrational thinking on his behalf. I think equally understandable are Mrs. Sutton's thoughts and emotions. As with any good mother, she did not want to see her son unhappy and suffering. When we're over the defendant's obsession, perhaps may have been justified by Mr. Asher's inexcusable rearrest during the Christmas Holiday of 1983. I think rhetorically you have to ask yourself the question, or at least I have, do these factors predicate justification for murder and murder for hire. In my own mind, I can say that they do not. Similarly there can be no justification for murder or the thought of murder even though the State's informant was devoid of anything good and decent. As much as informant Hignite's acts and character are despicable the evidence did not demonstrate an abandonment of the scheme by the defendants, notwithstanding the opportunities to do so. How does this weigh and what is an appropriate sentence? Uh, it can be said without doubt that the crime is a result of circumstances unlikely to reoccur. Further the evidence indicates that Cheryl Asher's acts did at the very least facilitate the crime and that such acts along with the inappropriate action of the State of Indiana did give some cause for some provocation on behalf, or at least from the eyes of the defendants. Also with the exception of two minor traffic offenses in the November '83 incident contributable to Mr. Asher, neither Mrs. Sutton nor Mr. Asher has a criminal history. And finally unique to Mrs. Sutton, is that imprisonment will in all likelihood cause a hardship to her 13 year old son, Terry. Yet, in all respects the imposition of a solely a suspended sentence and probation would conceivably be a mockery if not an outrageous mockery of our criminal justice system. For seldom, if ever, can murder be justified."

Record at 2059–62. This compassionate, and yet realistic, assessment of Sutton and her crime more than aptly supports the minimal sentence imposed by the trial court.

The judgment of the trial court is affirmed.

ROBERTSON, P.J., and NEAL, J., concur.