Lloyd CONN, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 24A01–1009–CR–508.

Court of Appeals of Indiana.

May 12, 2011.

**850**

John Pinnow, Special Assistant to the State Public Defender, Greenwood, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Andrew R. Falk, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROWN, Judge.

Lloyd Conn appeals his conviction for conspiracy to commit murder as a class A felony.[1] Lloyd raises one issue which we revise and restate as whether the evidence is sufficient to sustain his conviction. We affirm.

The facts most favorable to the conviction follow. In April 2009, Stacy Howell worked as a confidential informant with the Indiana State Police, and on three separate occasions Stacy purchased drugs from Bill Conn who was Lloyd's father. That same month, Bill was arrested and charged with three class B felonies as a result of these transactions. At some point a couple of years before, Stacy had been Lloyd's girlfriend and they had lived together. At the time of Stacy's involvement with the police, Lloyd's son, S.C., was in a relationship with Stacy's daughter, A.W., and S.C. would frequently stay at Stacy's mobile home in Cleves, Ohio.

After Bill's arrest, Bill and Lloyd began to speculate who had bought the drugs that resulted in the arrest, and "within a month or two [Bill] had narrowed it down" to Stacy. Trial Transcript at 74. Bill "told everybody he was going to take care of anybody that would testify against him." *Id.* at 105. Bill began to discuss with Lloyd about "doing something to Stacy to prevent her from testifying against him." *Id.* at 21. Also present for some of these conversations was Anthony King, a friend of Lloyd's, Barbara Spurlock who was Lloyd's sister, and S.C. In late September or early October 2009, the prosecutor for

---

1. Ind.Code § 35–41–5–2 (2004); Ind.Code § 35–42–1–1 (Supp.2007).

Bill's drug charges phoned Stacy and told her that the State had to release her name as the person who made the controlled buys, and soon after Stacy spoke with S.C. and A.W. about her involvement in the case. At some point, Lloyd told King that he wanted to murder Stacy because "[s]he was testifying against his dad and he brought her down there in an intimate relationship so he kind of felt responsible. . . ." *Id.* at 83.

When Bill received paperwork confirming that Stacy was the confidential informant, he stated that "we need to take [her] out." *Id.* at 119. Soon after, Bill asked Barbara to take A.W., who had stayed with the Conns over the weekend, back to Stacy's home in Ohio and "do surveillance on the mobile home and the surrounding area." *Id.* at 25. When Barbara returned, she briefed Bill and Lloyd on the "residence and the layout, how close the mobile homes were." *Id.* Barbara also spoke about how "[t]here was [sic] two dogs that was [sic] supposedly mean, uh, about the neighbors and what kind of neighbors, how many, how close they was [sic]. . . ." *Id.* at 79. King was also present for the conversation. Bill also repeatedly questioned S.C. about the layout of Stacy's home, the dogs, where the home was located, and whether there were woods nearby, and S.C. provided his grandfather with detailed answers. S.C. expressed concern to Bill, Lloyd, and King about A.W. during these conversations and requested that "he be allowed to get her out of the house when this was going to occur so she wouldn't witness it." *Id.* at 24.

Around Halloween 2009, Bill called King to his house and asked King to take Lloyd to Stacy's mobile home park in Ohio "to do surveillance . . . and . . . further formulate a plan to kill her." *Id.* King was "[k]ind of surprised that they would actually do it." *Id.* at 76. When King arrived at Bill's

residence, Lloyd was wearing a red sweatshirt but he changed into black clothing before they left. Lloyd gave King directions on how to get to the mobile home park, and they parked the vehicle at a gas station. The two men crossed a field and climbed the backside of a hill near the trailer park and "set down and just observed the trailer park when people was [sic] coming and going" for about three-and-a-half or four hours. *Id.* at 77. After observing the trailer park, Lloyd told King that he believed the easiest way to kill Stacy would be "through the living room window while she was sitting on the couch watching T.V." around "the evening like ten or eleven" because [t]hat's when most people was [sic] in bed." *Id.* at 82–83.

About a week later, King was again at Bill's house, and while King and Bill were inside watching television they heard a gunshot. Afterwards, Lloyd entered the house and asked the men how many shots they heard, and they answered that they heard one shot. Lloyd replied that he "shot twice" and asked them to "[c]ome out here and look." *Id.* at 80. The three men went outside and Lloyd demonstrated how he was "putting milk jugs over the end" of a double barrel shotgun in order to muffle the sound. *Id.* The shotgun was memorable because it was a "20 gauge double barrel shotgun, which there aren't very many of," and had "a bright orange fiber optic site" on it. *Id.* at 29. Lloyd fired the shotgun three times and stated: "That ought to do it, don't you think?" *Id.* at 26.

On January 20, 2010, a bond reduction hearing was held related to the charges filed against Bill, and both Stacy and King were in attendance. King told Stacy that she was not "safe," and that she should "watch herself because [Bill and Lloyd were] planning on killing her." *Id.* at 61, 73. King told Stacy that he and Lloyd had

been to her mobile home park and had sat "in [her] wood-line waiting to get a clear shot at [her]." *Id.* at 61. Lieutenant Kenneth Murphy of the Indiana State Excise Police overheard their conversation and asked what they were talking about, and King started the story over again for the officer. Lieutenant Murphy then "immediately stopped him" and found Indiana State Police Detective Tim Wuestefeld, who had been investigating Bill since December 2008, and King "laid out a timeline" and recounted the conversations with Bill and Lloyd that King had been present for regarding a plot to kill Stacy. *Id.* at 20–21.

After the officers interviewed King, he led Detective Wuestefeld to the mobile home park where he and Lloyd had previously been and showed Detective Wuestefeld the gas station where they had parked, the field they crossed, and the hill where they conducted their surveillance. While there, they passed Stacy and became aware that, although they were at the right trailer park, Lloyd and King had been surveilling the wrong house. Also, King informed the police of where they could recover the milk jugs Lloyd was testing to muffle the shotgun which another officer recovered from Bill's property in a field across from Bill's residence.

On January 26, 2010, the State charged Lloyd with conspiracy to commit murder as a class A felony, which was later amended. On July 26, 2010, a jury trial commenced in which facts consistent with the foregoing were presented. At trial, Mackenzie Diouf, a firearms examiner with the Indiana State Police, testified that the milk jug contained a hole that "was positive for lead on the inside" which was "consistent with a gunshot." *Id.* at 47, 49. King testified that a shotgun fired by Lloyd caused the hole in the milk jug that

was recovered from Bill's property. *Id.* at 81. Also, Lloyd and Bill both testified and denied that any conspiracy to murder Stacy had existed. On July 28, 2010, the jury found Lloyd guilty as charged. On August 25, 2010, the court sentenced Lloyd to forty-five years in the Department of Correction with five years suspended to probation.

 The issue is whether the evidence is sufficient to sustain Lloyd's conviction. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State,* 656 N.E.2d 816, 817 (Ind.1995), *reh'g denied.* Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

The offense of conspiracy to commit murder is governed by Ind.Code § 35–41–5–2 and Ind.Code § 35–42–1–1. Ind.Code § 35–41–5–2 provides that "[a] person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit·the felony[,]" and "either the person or the person with whom he agreed performs an overt act in furtherance of the agreement." Ind.Code § 35–42–1–1 provides that "[a] person who: (1) knowingly or intentionally kills another human being . . . commits murder, a felony." Thus, to convict Lloyd of conspiracy to commit murder, the State needed to prove that Lloyd: (1) with intent to commit murder, (2) entered into an agreement with Bill and/or Barbara to commit the felony, and (3) that either Lloyd or the person with whom Lloyd agreed performed an overt act in furtherance of the

agreement.[2] *See Dickenson v. State*, 835 N.E.2d 542, 552 (Ind.Ct.App.2005) (citing *Fry v. State*, 748 N.E.2d 369, 374 (Ind. 2001)), *trans. denied.*

■ The nature of the evidence required to prove a conspiracy agreement has been summarized as follows:

> A conspiracy entails an intelligent and deliberate agreement between the parties. But the state is not required to prove the existence of a formal express agreement. It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense.... This may be inferred from the acts committed and the circumstances surrounding the defendant's involvement. Understandably then, a conviction for conspiracy may, and often will, rest solely on circumstantial evidence.

*Minniefield v. State*, 512 N.E.2d 1103, 1105 (Ind.1987) (quoting *Sutton v. State*, 495 N.E.2d 253, 257 (Ind.Ct.App.1986), *reh'g denied, trans. denied*) (internal citations and quotations omitted). The State is not required to prove that murder was actually committed or even attempted. *Weida v. State*, 778 N.E.2d 843, 846 (Ind. Ct.App.2002).

■ Lloyd first argues that "[t]here is no direct evidence [he] had an agreement with Bill Conn and/or his sister to kill Stacy." Appellant's Brief at 8. However, we find that there is substantial evidence from which the jury could have found that Lloyd entered into an agreement with Bill and/or Barbara to commit murder. The State presented evidence at trial that Bill and Lloyd discussed "doing something to Stacy to prevent her from testifying" against Bill. Trial Transcript at 21. Bill stated that "we need to take [her] out." *Id.* at 119. Barbara, who was Bill's daughter and Lloyd's sister, under the guise of taking A.W. back to Stacy's, agreed to "do surveillance on the mobile home and the surrounding area." *Id.* at 25. Also, at some point S.C., who was Lloyd's son, requested of Bill and Lloyd that "he be allowed to get [A.W.] out of the house when [the murder was] going to occur so she wouldn't witness it." *Id.* at 24. Lloyd also agreed to go with King to the mobile home park, "do surveillance ... and ... further formulate a plan to kill her," and concluded that the easiest way to kill Stacy was to shoot her through a window while she was watching television. *Id.*

■ Lloyd also argues that "[t]he overt acts the State alleged did not further the conspiracy objective of killing Stacy." Appellant's Brief at 10. At trial, the State presented evidence of numerous overt acts performed by one or more of the co-conspirators, including: (1) Barbara performing surveillance of Stacy's home and reporting back as to what she observed; (2) Lloyd, at Bill's direction, surveilling Stacy's mobile trailer park; and (3) Lloyd testing a homemade silencing device on a shotgun.

■ First, regarding Barbara's surveillance of Stacy's home, Lloyd argues that "[h]er actions were at most prepatory steps that did not further the conspiracy," Appellant's Brief at 9, and cites to *Collier v. State*, 846 N.E.2d 340 (Ind.Ct.App.2006),

---

2. The charging information, as amended, charged the following as overt acts:

> Bill S. Conn instructed Barbara A. Gambill Spurlock to do surveillance on the home of Stacey [sic] Howell and/or Bill S. Conn instructed Lloyd Conn and Anthony King to do surveillance on the home of Stacey [sic]

> Howell (which they did), in order to carry out the plan to murder Stacey [sic] Howell, and further Lloyd Conn experimented with a gun on how he was going to shoot Stacey [sic] Howell.

Appellant's Appendix at 54.

*trans. denied,* which addresses the "substantial step" requirement for an attempt crime. 846 N.E.2d at 344. *Collier* defines "substantial step" for attempt crimes as "any overt act beyond mere preparation and in furtherance of intent to commit an offense." *Id.* The relevant statute governing conspiracy, however, requires only the showing of the performance of "an overt act in furtherance of the agreement." Ind. Code § 35–41–5–2. Indeed, the Indiana Supreme Court recently stated that "[t]he overt act need not rise to the level of a 'substantial step' required for an attempt to commit the felony." *Owens v. State,* 929 N.E.2d 754, 756–757 (Ind.2010), *reh'g denied.* Thus, there is no requirement that in order to prove a crime of conspiracy the State must prove that the overt act went beyond prepatory steps. The record reveals that Barbara surveilled Stacy's home after Bill asked her to do so. Lloyd's argument is without merit. *See Dickenson,* 835 N.E.2d at 552–553 (holding that helping to "prepare a letter concerning the details" of an agreement to commit murder was a valid overt act); *Smith v. State,* 655 N.E.2d 532, 540 (Ind.Ct.App. 1995) (noting that "the length of time between the overt act and the commission of the underlying felony is of no significance to the elements of the crime itself"), *reh'g denied, trans. denied; Molina v. State,* 621 N.E.2d 1137, 1142 (Ind.Ct.App.1993) (holding that the State presented evidence of overt acts to prove conspiracy to commit murder including providing a payment of $100.00, providing information including a photograph of victim, the victim's work schedule, and a vehicle description, and driving co-conspirator past victim's residence to "apprise [co-conspirator] of the location"); *c.f. Chavez v. State,* 722 N.E.2d 885, 891 (Ind.Ct.App.2000) (noting that a conviction for conspiracy to commit dealing in marijuana may be found where members of agreement did not yet possess marijuana with the intent to deliver), *reh'g denied.*

Second, Lloyd challenges his surveillance of the mobile home park because "they were watching the wrong trailer" and thus the surveillance "did not further the plan to kill Stacy." Appellant's Brief at 10. Initially, we note that although Lloyd and King were surveilling the wrong house, they were at the correct mobile home park and were able to determine that the best time to murder Stacy would be around "the evening like ten or eleven" because [t]hat's when most people was [sic] in bed." *Id.* at 82–83. Thus, we cannot say that the information gleaned from their surveillance was entirely useless as suggested by Lloyd. Moreover, we note that the State is not required to show that the overt act actually advanced the objective, *per se,* but rather that the act was done for the purpose of advancing, or "in furtherance of," the agreement. *See Archbold v. State,* 397 N.E.2d 1071, 1073 (Ind.Ct.App.1979) (noting that conspiracy to commit a felony can be committed despite the fact that the goal of the conspiracy is factually impossible to achieve).

Finally, Lloyd argues that the evidence of his experimentation with a milk jug silencing device was not an overt act because "a shotgun blast is still going to make a lot of noise," and thus it did not further the conspiracy. Appellant's Brief at 10. We note that there is nothing in the record to show that the homemade device was ineffective. Indeed, Bill and King told Lloyd that they did not hear one of the shotgun shots, and Lloyd himself proclaimed regarding his device: "That ought to do it, don't you think?" Trial Transcript at 26. Also, as noted above the State is not required to prove that the overt act actually advanced the objective of the agreement.

Any one of the three overt acts presented by the State was enough to prove that a conspiracy to murder Stacy existed. Accordingly, we conclude that evidence of probative value was presented at trial from which a jury could find that Lloyd entered into an agreement with Bill and/or Barbara to murder Stacy and that overt acts were taken to further that conspiracy. *Minniefield*, 512 N.E.2d at 1105–1106 (holding that the evidence was sufficient of an agreement and that an overt act was taken to sustain the defendant's conviction for conspiracy to commit murder).

For the foregoing reasons, we affirm Lloyd Conn's conviction for conspiracy to commit murder as a class A felony.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.