**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 19 2012, 8:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KENNETH R. MARTIN**
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANN L. GOODWIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BART A. DEWALD, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1010-CR-541 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Evan S. Roberts, Judge
Cause Nos. 20D01-0804-FB-8 and 20D01-0804-FC-32

**January 19, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Bart A. Dewald was convicted of two counts of conspiracy to commit aggravated battery,[1] each as a Class B felony, criminal confinement[2] as a Class C felony, intimidation[3] as a Class C felony, pointing a firearm[4] as a Class D felony, and criminal recklessness[5] as a Class A misdemeanor; he received an aggregate sentence of thirty-eight years. Dewald appeals, raising six issues, which we restate as:

I.      Whether Dewald's two convictions for conspiracy to commit aggravated battery are supported by sufficient evidence of two separate agreements;

II.     Whether the trial court erred by admitting certain audio recordings into evidence;

III.    Whether Dewald was unfairly prejudiced by testimony that he had been sentenced in a prior matter;

IV.     Whether the charge of pointing a firearm had been dismissed and should not have been prosecuted;

V.      Whether sufficient evidence was presented to support the convictions of criminal confinement, intimidation, pointing a firearm, and criminal recklessness; and

VI.     Whether Dewald's sentence is inappropriate in light of the nature of the offenses and the character of the offender.

We affirm in part, reverse in part, and remand with instructions.

---

[1] *See* Ind. Code §§ 35-42-2-1.5, 35-41-5-2.

[2] *See* Ind. Code § 35-42-3-3(b)(1).

[3] *See* Ind. Code § 35-45-2-1(a)(1).

[4] *See* Ind. Code § 35-47-4-3(b).

[5] *See* Ind. Code § 35-42-2-2(c)(1).

2

## FACTS AND PROCEDURAL HISTORY

At all times relevant to this appeal, Dewald was a bail bondsman in Elkhart, Indiana. In 2008, he was convicted of two counts of Class D felony criminal confinement in Elkhart Superior Court 3, with the Honorable George W. Biddlecome presiding. Generally, the facts alleged and proven were that Dewald, while acting as a bail bondsman and fugitive recovery agent, illegally detained two women in June 2006. Elkhart County Deputy Prosecutor Peter Britton prosecuted the criminal confinement case against Dewald, who was ultimately found guilty and convicted ("*Dewald I*"). This court affirmed the criminal confinement convictions by published opinion. *Dewald v. State*, 898 N.E.2d 488 (Ind. Ct. App. 2008), *trans. denied* (2009).

In October 2007, prior to sentencing in *Dewald I*, Dewald was involved in an encounter with competing bail bondsman Randy Abel ("Abel"). Specifically, on October 25, 2007, Abel was in the lobby of the Elkhart County Jail, located in Goshen, Indiana, doing bond business, and Dewald came through the door, walked up behind Abel, who turned around and was startled to see Dewald standing within a foot of his face and staring at him. According to Abel, Correctional Officer Lane Gaby was present in the lobby, noticed the situation, and instructed Dewald to "get away" from Abel. *Tr*. at 1416.

Abel left the jail in Goshen and drove on U.S. 33, a four-lane road, to an appointment with his attorney in Elkhart. Dewald's car, bearing a front license plate that said "Dewald," approached Abel's vehicle at a high rate of speed and, at times, was one to two feet from Abel's rear bumper. Abel saw Dewald driving the car and observed him waving a handgun "left to right, right to left, left to right." *Id*. at 1431. At one point, Dewald drove his vehicle

3

along the side of Abel's car, which was in the passing lane, and began to veer into Abel's lane. To avoid a collision with traffic, Abel was forced to brake with such force that his file folders on the passenger seat landed on the floor. *Id*. at 1440.

Nearing Elkhart, U.S. 33 narrowed to two lanes, and Dewald positioned his vehicle in front of Abel's. After passing through a green traffic light, Dewald abruptly stopped his car, although no one was in front of him, forcing Abel to stop his vehicle. Dewald exited his vehicle and began approaching Abel's, which was surrounded by Dewald's car in front of him, another car behind him, oncoming traffic to one side, and a curb and some sort of barriers on the other side. Before reaching Abel's car, Dewald turned around, returned to his car, and drove away.

When Abel reached his attorney's office, he parked his vehicle, and Dewald pulled along the side of Abel's car and waved the gun for up to ten seconds, and then drove away. After Abel met with his attorney, he notified authorities of Dewald's conduct. When Abel went to the jail the next day to file a report with police, he encountered Dewald, who was heard saying to Abel, "Fat man, watch your back." *Id.* at 1131. Correctional Officer Gaby, also in the lobby, heard Dewald loudly call Abel an "asshole" as Abel walked through the lobby. *Id*. at 1157.

On January 18, 2008, the State charged Dewald with criminal confinement of Abel, intimidation, pointing a firearm, and criminal recklessness for his conduct on October 25, 2007. Deputy Prosecutor Britton filed the charges, which were brought in Elkhart Superior Court 3, under cause number 20D03-0801-FC-4 ("FC-4"). Dewald was taken into custody on January 24, 2008, but posted bond on January 29, 2008 and was released.

4

On March 6, 2008, Dewald contacted his long-time acquaintance Kevin Bronson ("Bronson"),[6] an acclaimed martial arts expert who was known to perform physical harm for money, to discuss "some people that were causing him problems in his life." *Id*. at 969. Later that day, Dewald met with Bronson and Tony DeLaughter ("DeLaughter"), known as "the Reaper;" Bronson included DeLaughter in the meeting because Bronson was no longer personally performing contracts for physical harm. *Id*. at 969, 985. To meet the men, Dewald drove to Warsaw, Indiana and parked in a vacant lot near a Lowe's hardware store; DeLaughter was driving his Avalanche, in which Bronson was a passenger, and they picked up Dewald and drove elsewhere. Neither Bronson nor Dewald knew it, but DeLaughter recorded the meeting. As DeLaughter drove, Dewald advised that he wanted to have Abel severely beaten. Dewald explained that Abel was his top competitor, and Abel had made allegations against Dewald that caused Dewald to lose his bail bondsman license. Dewald wanted Abel's teeth knocked out and wanted his injuries to require hospitalization; Dewald hoped to be able to walk into Abel's hospital room, smile, and spit on him. Dewald suggested that they might consider inflicting the injuries upon Abel on March 20, 2008, because Dewald would be at sentencing on *Dewald I*, thereby giving him an alibi, or, alternatively, Abel could be beaten when leaving the jail after doing bond work because Abel would be unarmed at that time. Dewald presented a "dossier" on Abel, including a picture, home address, work location, routines, and a specific description of Abel's vehicle. *Id*. at

---

[6] Bronson holds black belt rank in twenty-three martial arts and is a two-time inductee into the United States Martial Arts Hall of Fame and a two-time inductee into the World Hall of Fame. Others that have achieved that recognition include Bruce Lee and Chuck Norris. *Tr*. at 965. Bronson had at one time been in the "physical harm business," but after serving prison time, was trying to avoid that line of work. *Id*. at 975.

5

987. For the requested work, Bronson quoted Dewald a price of between five and ten thousand dollars. Dewald placed an envelope of one thousand dollars cash on the console of the vehicle as "down payment." *Id*. at 989, 1085. Bronson told Dewald that they would work out the payment situation, and then he instructed DeLaughter to take Dewald back to the parking lot where they had picked him up.

At that point, Dewald stated there was another person to discuss, indicating that he wanted the same treatment for Deputy Prosecutor Britton. As he did with Abel, Dewald provided a dossier on Britton including his home address, where he attended church, and a description of his car. Dewald did not suggest a specific time or date to beat Britton. Bronson and DeLaughter did not request any further payment of money, beyond the original stated price of between five and ten thousand dollars. After dropping off Dewald, DeLaughter advised Bronson that he had recorded the meeting, and thereafter DeLaughter reported the matter to the Elkhart County Prosecutor's Office.

Several days later, on March 10, 2008, through coordination with the prosecutor's office, Bronson called Dewald in a recorded telephone call to advise him that DeLaughter would be handling the physical aspect of the job and therefore DeLaughter would be calling Dewald later to arrange a meeting to discuss the details. Later that day, DeLaughter telephoned Dewald, again recording the conversation, and he arranged to meet Dewald that afternoon in Elkhart County near a Taco Bell at a specified time. Pursuant to their arrangement, Dewald joined DeLaughter in DeLaughter's car, which was equipped with recording devices, and the two discussed what exactly Dewald wanted done to Abel and to Britton. Dewald confirmed that he desired Abel's injuries to require hospitalization. Dewald

6

shared that he was so "pissed" at Abel that he would be inclined to "blow his f*cking head off" with a shotgun, but due to repercussions of that, he did not want them to actually go that far. *Id.* at 1262. Dewald described the desired harm to Britton to be "an old-fashioned ass kicking." *Id.* at 1263. After this meeting with DeLaughter, police arrested Dewald.

The State charged Dewald on March 13, 2008, with two counts of Class B felony conspiracy to commit aggravated battery. The case was originally assigned to Elkhart Superior Court 3, but in April 2008, the two-count conspiracy case and previously-charged FC-4 were transferred from Elkhart Superior Court 3 to Elkhart Superior Court 1, where they would eventually be tried together.

Prior to trial, in February 2009, Dewald filed a verified motion for psychiatric examination, to determine his competency to stand trial. One doctor found Dewald competent to stand trial, and the other concluded that Dewald had severe anxiety disorder and that, although there was some consideration to the fact that Dewald might be malingering, Dewald was not competent to stand trial. The parties agreed to commitment of Dewald for competency restoration services. In March 2010, the facility filed a report with the trial court notifying it that Dewald was competent to stand trial.

In August 2010, a consolidated jury trial was held on all six combined charges. Bronson, DeLaughter, Abel, and Britton testified at trial, along with a number of other witnesses. During the trial, the State offered as exhibits the audio recordings of March 6, when Dewald met with Bronson and DeLaughter, and March 10, when Dewald met alone with DeLaughter. Dewald objected, asserting a lack of authentication and foundation. DeLaughter stated that he had listened to the recordings, and they fairly and accurately

7

depicted the conversations on those dates. The trial court overruled the objections and admitted the recordings into evidence.

The jury convicted Dewald as charged. At the September 2010 sentencing hearing, Dewald personally spoke for over two hours, claiming among other things that he was not guilty of the *Dewald I* criminal confinement convictions (involving the two women in June 2006) and that there was a continuing fraud occurring in Judge Biddlecome's court because that trial court was engaging in a practice of waiving forfeiture of Abel's bonds when defendants failed to appear for trial.

After identifying aggravating and mitigating circumstances, the trial court sentenced Dewald to twenty years of imprisonment for each of the two Class B felony conspiracy to commit aggravated battery convictions, to be served consecutively, but with ten years of one sentence suspended. For his other four convictions, the trial court imposed the following sentences, to run concurrently to each other but consecutively to the conspiracy convictions: eight years for Class C felony criminal confinement; eight years for Class C felony intimidation; three years for Class D felony pointing a firearm, and one year for Class A misdemeanor criminal recklessness. The aggregate executed sentence for the six convictions was thirty-eight years. Dewald now appeals.[7]

---

[7] Although the six charges were tried together, the parties were directed to continue referencing two separate cause numbers in the trial court, one for the two aggravated battery charges and one for the other four charges. Consequently, Dewald initially filed two separate appeals with this court (Cause Nos. 20A03-1010-CR-541 and 20A03-1010-CD-545). Thereafter, Dewald filed a motion to consolidate, which we granted, consolidating the two appeals into Cause No. 20A03-1010-CR-541.

## DISCUSSION AND DECISION

### I.    Multiple Conspiracy Convictions

Dewald was charged and convicted of two counts of Class B felony conspiracy to commit aggravated battery, Count I relative to Britton and Count II regarding Abel. On appeal, Dewald asserts that there was only one agreement, even though it involved two victims, and therefore he could be convicted of only one conspiracy charge. In *Perkins v. State*, our Supreme Court held,

> The gist of the offense of conspiracy is the agreement. A single agreement to commit several unlawful acts cannot be punished by multiple convictions under a general conspiracy statute.

483 N.E.2d 1379, 1386 (Ind. 1985) (citing *Braverman v. United States*, 317 U.S. 49, 53, 63 S. Ct. 99, 101 (1942)). The "one conspiracy, one conviction rule derives from the notion that the agreement is the criminal act, and therefore one agreement supports only one conspiracy, even if multiple crimes are the object of the agreement." *Thacker v. State,* 709 N.E.2d 3, 7 (Ind.1999); *see also Coleman v. State*, 952 N.E.2d 377, 382 (Ind. Ct. App. 2011). When there are separate agreements, however, multiple convictions do not violate the one conspiracy, one conviction rule. *See Drakulich v. State*, 877 N.E.2d 525, 532-33 (Ind. Ct. App. 2007), *trans. denied* (2008) (evidence supported jury's finding of multiple conspiracies where sales of unregistered securities were sold on six different dates at different locations to different victims).

The State initially argues that Dewald waived his claim that his two conspiracy convictions cannot stand because he failed to raise the issue to the trial court. Specifically, the State asserts that, under Dewald's theory, there was only one agreement and thus there

could only be one conspiracy charge; therefore, Dewald should have moved to dismiss under Indiana Code section 35-34-1-4 on the basis of a defective charging information. Additionally, the State observes, Dewald did not object to the trial court's proposed preliminary instructions, offer any final instructions on the "one conspiracy, one agreement" rule, did not move for a directed verdict on this basis, and did not argue in closing remarks that that there was only one agreement and, consequently, the State should not have brought two conspiracy charges against Dewald. *See Appellee's Br*. at 18. For all these reasons, the State asks us not to address his claim now brought, for the first time, on appeal. Without expressly deciding the State's waiver argument, we observe that whether one or several conspiracies occurred is a question of fact for the jury. *Saunders v. State,* 562 N.E.2d 729, 739 (Ind. Ct. App. 1990), *aff'd in relevant part,* 584 N.E.2d 1087 (Ind. 1992); *Ridgeway v. State*, 422 N.E.2d 410, 413 (Ind. Ct. App. 1981). Because the question of whether one or several conspiracies occurred is a question of fact for the jury, our task on appeal is to determine whether the evidence was sufficient to show Dewald entered into two "distinct conspiratorial agreements." *Saunders*, 562 N.E.2d at 739; *see also Drakulich*, 877 N.E.2d at 532-33.

When reviewing the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Conn v. State*, 948 N.E.2d 849, 852 (Ind. Ct. App. 2011). Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if evidence of probative value exists from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

10

Indiana Code section 35-41-5-2 provides that a person conspires to commit a felony when, with intent to commit the felony, he agrees with another person to commit the felony. The State must allege and prove that either the person or the person with whom he agreed performed an overt act in furtherance of the agreement. When the State brings multiple charges of conspiracy, as it did here, "the relevant inquiry is whether there existed more than one agreement to perform some illegal act or acts." *Perkins,* 483 N.E.2d at 1386. Determining whether a defendant entered into one or several agreements involves consideration of several factors, including: the nature of the criminal scheme, the common participants, the proximity in time, and the frequency, quality, and duration of the conspirator's involvement in each crime. *Mftari v. State*, 537 N.E.2d 469, 475 (Ind. 1989); *Saunders,* 562 N.E.2d at 739. In this case, Dewald asserts that the evidence at trial establishes that there was only one agreement, not two separate agreements, and thus one conspiracy. After careful review of the record before us, we agree.

First, we consider the two recorded conversations. In the first meeting, on March 6, 2008, Dewald met with Bronson and DeLaughter, in DeLaughter's vehicle, for approximately forty minutes. Within that one meeting, Dewald advised that he wanted Abel beaten to the point of hospitalization and then, in the second half of the meeting, he brought up Britton, asking that the same harm be inflicted upon him. Approximately in the middle of the meeting, Dewald provided the envelope containing one thousand dollars in cash, stating that was all the money he had to give them; Bronson indicated that the one thousand dollars would be considered a down payment. Near the end of the meeting, as they were driving

11

Dewald back to his vehicle, Bronson opined, "I see this going forward," the phrasing of which suggests an understanding of a singular agreement. *State's Ex*. 28.

Turning to the next recorded meeting, on March 10, 2008, Dewald met with DeLaughter for twenty minutes in DeLaughter's vehicle to review and distill the details of the previously-made plan to injure Abel and Britton. DeLaughter asked Dewald to specify exactly what he wanted done to Abel and what he wanted done to Britton; Dewald responded that he wanted Abel's face to look like a mess and would require hospitalization and that Britton should get "an old-fashioned ass kicking." *State's Ex*. 36. Dewald clarified that, as far as priority, Abel was "the main concern." *Id*. In the conversation, Dewald expressed some concern over money, namely that he had no more to offer, and DeLaughter responded it was all to be done "for one price." He said to Dewald, "You came to [Bronson] with these two and these two will be taken care of by [Bronson.]" *Id*. DeLaughter explained to Dewald that final payment would be due on completion. The facts and circumstances of these recorded conversations evidence one agreement with two intended victims, who would be physically beaten for one specified price.

Trial testimony likewise supports just one agreement. During trial, Bronson, testifying under subpoena, described the March 6 meeting in DeLaughter's vehicle, where Dewald sought to hire him to harm Abel and Britton, that Dewald provided paperwork ("dossiers") with information about Britton and Abel, and that the two "primary targets" were Abel and Britton. *Tr*. at 987-88. Bronson described his inquiry to Dewald on March 6: "What exactly do you want done to *them* and when?" *Id*. at 989 (emphasis added). Bronson testified that Dewald "wanted *them* severely hurt" and "wanted *them* to know it was him."

12

*Id.* (emphasis added). Bronson said that Dewald "put a down payment of $1,000 down," but that the total fee would be somewhere between five thousand and ten thousand dollars. *Id.* Looking at the totality of Bronson's testimony, it was presented in terms of one agreement with two victims.

DeLaughter testified at trial in a like manner that suggested one agreement. For instance, according to DeLaughter, Dewald wanted Abel "f*cked up and put in the hospital for an extended stay," and he wanted the same for Britton. *Id.* at 1261. DeLaughter said that Dewald provided one thousand dollars, but Bronson had said that five thousand was going to be the final price.

In arguing for the existence of two separate agreements, and thus two conspiracies, the State asserts that, even though the two beatings were arranged in the same meeting, the timing suggests that one agreement was already made concerning Abel before the second agreement was made concerning Britton. That is, Abel was discussed first, whereas Britton was discussed only after what at first seemed to be the conclusion of the meeting. *See Appellee's Br.* at 20. However, we reject the State's request to, effectively, split hairs. The fact that Britton was discussed later in the March 6 forty-minute meeting, rather than simultaneously with Abel, does not result in the existence of two separate agreements. As this court has observed, we must be cognizant of the potential danger of confusing separate acts at separate times with separate conspiracies:

> [A]lmost any venture, criminal or legitimate, is analyzable into a series of bits, each of which, in turn, is characterizable as an independent plan or goal. The standard for determining the existence of a single conspiracy, however, ". . . is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy . . . ."

13

*Ridgeway*, 422 N.E.2d at 413-14 (citations omitted).

This case does not present "discrete transactions," but rather a single agreement to hurt multiple people. *See Sharp v. State*, 569 N.E.2d 962, 970 (Ind. Ct. App. 1991) (evidence established single agreement to sell several kinds of narcotics). Given the evidence in the record before us, we cannot say that sufficient evidence supported a finding of multiple agreements and, therefore, multiple conspiracies. We vacate Dewald's conviction for Count II, conspiracy to commit aggravated battery, for which Dewald received a sentence of twenty years with ten years suspended.

## II.     Admission of the Audio Recordings

During DeLaughter's trial testimony, the State introduced, in support of the conspiracy charges against Dewald, the recorded conversations of March 6, when Dewald met with Bronson and DeLaughter in Warsaw, Indiana ("Exhibit 28"), and March 10, when Dewald met with DeLaughter in Elkhart County, Indiana ("Exhibit 36"). During the conversations, Dewald requested that Bronson and DeLaughter, for compensation, inflict harm on Abel and Britton that would result in hospitalization. Dewald objected to each recording on the basis of authenticity and foundation. *Tr.* at 1292, 1315. The trial court overruled the objections and admitted the audio recordings into evidence.

A trial court has wide discretion in deciding whether to admit an audiotape into evidence. *Benavides v. State*, 808 N.E.2d 708, 710 (Ind. Ct. App. 2004) (citing *Dearman v. State,* 743 N.E.2d 757, 759 (Ind. 2001), *trans. denied*). We will not reverse the trial court's decision unless it represents a manifest abuse of discretion that results in the denial of a fair

14

trial. *Id*. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

In *Lamar v. State,* the Indiana Supreme Court held that one of the foundational requirements for admitting an audiotape into evidence is that it be of such clarity as to be intelligible and enlightening to the jury. 258 Ind. 504, 511, 282 N.E.2d 795, 800 (1972). This rule requires that the audiotape be intelligible enough to be probative of the purpose for which it is being offered. *Benavides*, 808 N.E.2d at 711. Audio or video perfection is not required; the focus is "whether the recording taken as a whole, or a crucial segment thereof, is of such poor quality that it is likely to lead the jury to speculation as to its contents." *Appellant's Br*. at 14 (citing *Smith v. State*, 272 Ind. 328, 397 N.E.2d 959 (Ind. 1979)). Necessarily, the probative value must not be substantially outweighed by the danger of confusion or unfair prejudice. *Benavides*, 808 N.E.2d at 711 (citing Ind. Evidence Rule 403).

On appeal, Dewald maintains it was error for the trial court to admit the recordings into evidence, not because of foundational or authenticity concerns, but because the audio quality was poor, actually inaudible in portions, and therefore the Exhibits were not helpful to the jury. The State maintains that Dewald has waived his claim that the audio recordings were not sufficiently audible to be admitted. We agree. A party may not object on one basis at trial and raise a second ground challenging admissibility on appeal; such a claim is waived. *Houser v. State*, 823 N.E.2d 693, 698 (Ind. 2005). Furthermore, although Dewald generally claims the admission of the recordings was "prejudicial" to him, *Appellant's Br*. at 15, he provides no support or argument for that assertion, and as such, it is waived. Ind. Appellate

15

Rule 46(A)(8) (failure to provide appellate court with cogent argument with citations of supporting authority waives issue).

Waiver notwithstanding, we find that the trial court did not abuse its discretion when it admitted the audio recordings. DeLaughter testified that he had listened to the recordings and that they fairly and accurately reflected the conversations on March 6 and 10 where Dewald discussed first, with both Bronson and DeLaughter, and then with DeLaughter alone, his desire to hire both of them, or either of them, to inflict physical harm on Abel and Britton. This court reviewed the recordings, Exhibits 28 and 36, and found the majority of the conversations to be audible, and we conclude that the recordings were sufficiently clear to enlighten the jury about Dewald's requests and plans to have Abel and Britton beaten to the point of requiring hospitalization. The trial court properly admitted the audio recordings of the March 6 and March 10 meetings.

### III.    Reference to Previous "Sentencing"

During the State's case-in-chief, it called as a witness Elkhart County deputy prosecuting attorney Britton. In testifying to his background and experience, Britton explained that, while working in Elkhart Superior Court 3, he prosecuted misdemeanors and up to Class D felony crimes. At one point, the State sought to inquire about Britton's involvement with Dewald's sentencing in March 2008. Dewald's counsel objected[8] to the State's use of the word "sentencing." *Tr.* at 919. Dewald's counsel recognized its relevance

---

[8] There exists a degree of confusion concerning whether Dewald objected (or not): On one hand, Dewald in his brief asserts that he objected at trial, but our review of the record before us reveals that, although at one point during the exchange at the trial bench, Dewald's counsel states an objection, *Tr.* at 919-20, later during that same exchange he expressly states that he was not objecting. *Tr.* at 924-25. Since there appears to have been an objection lodged, we will proceed from that premise.

to the issue of motive, namely Dewald's motive for desiring to have Britton injured by professionals, but argued that its prejudicial effect outweighed the relevance, and thus it should be excluded under Evidence Rule 403. Specifically, defense counsel argued that it was prejudicial because "sentencing" raised the inference that Dewald had previously been convicted of a felony; the State responded that the fact Britton prosecuted Dewald would not automatically imply that it was a felony. The trial court overruled Dewald's objection and allowed the State to question Britton about his involvement with Dewald's March 2008 sentencing. On appeal, Dewald asserts that the trial court committed error by allowing the testimony.

Evidence of motive to commit a crime is always relevant. *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009) (citing *Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996)). While relevant evidence is admissible, Evidence Rule 401, it may be excluded if its probative value is substantially outweighed by danger of undue prejudice. Evid. R. 403.

Here, the trial court gave the parties considerable opportunity to argue their positions about the use of "sentencing." *Tr*. 911-15, 918-25. The trial court observed that Britton's involvement in Dewald's March 2008 sentencing was "inextricably intertwined" with Dewald's motive for conspiring to have Britton beaten and hospitalized, i.e., the conspiracy charges. *Id*. at 920. Moreover, the trial court recognized that Dewald expressly stated on the March 6, 2008 audio recording that he was going to be sentenced on March 20, 2008, and even suggested to Bronson and DeLaughter that March 20 might be a particularly good date to inflict the injuries because Dewald would be in sentencing, and thus, he would be provided

with an alibi. Accordingly, the trial court noted, "the word sentencing [] inevitably is gonna come out[.]" *Id*. at 922.

We conclude that the probative value of Britton's testimony referencing Dewald's March 2008 sentencing, which did not mention the conviction or crimes for which he was sentenced, outweighed any possible prejudicial effect from the testimony. Not only was it was relevant to Dewald's motive for conspiring to harm Britton, it was cumulative of Dewald's own statements on the March 6 audio recording. We discern no trial court error on this issue.

**IV.    Prosecution of the Pointing a Firearm Charge**

On January 18, 2008, the State charged Dewald with four counts: Count I criminal confinement, Count II intimidation, Count III pointing a firearm, and Count IV criminal recklessness, all stemming from Dewald's encounters with Abel on October 25, 2007. The charges were filed in Elkhart Superior Court 3, Judge Biddlecome presiding. Later, when the case was transferred to Superior Court 1, the Honorable Evan S. Roberts presiding, the pointing a firearm charge became Count V (as the two conspiracy charges became Counts I and II). Following a jury trial, Dewald was tried and convicted of all charges. On appeal, Dewald claims that the pointing a firearm charge was dismissed and never refiled, and thus he should not have been tried or convicted of that offense.

The history of the issue is relevant to our discussion. When the case came for trial in Superior Court 1, and the parties were reviewing preliminary instructions, the pointing a firearm count did not appear anywhere in the instructions. Judge Roberts reviewed the record and stated that, while it was not clear why, Judge Biddlecome in Superior Court 3

18

appeared to have had marked with a pen on the charging information to strike the pointing a firearm charge, and the chronological case summary from Superior Court 3 also noted that the original charging information was "modified to Three Counts." *Appellant's App*. at 1.

Thus, while reviewing the instructions, Judge Roberts and counsel discussed whether Judge Biddlecome had possessed the authority to unilaterally dismiss the pointing a firearm charge, seemingly because he found a lack of probable cause. The State took the position that the pointing a firearm charge was never dismissed, was filed in Superior Court 1 when the case was transferred there from Superior Court 3, and that it remained pending and the State intended to prosecute the offense. Counsel for Dewald conceded that he had "overlooked that aspect of the case" (i.e., that Judge Biddlecome had struck the charge), and that he "ha[d] proceeded as though the pointing the firearm [charge] was part of the case" and "had anticipated moving forward and defending on it." *Tr*. at 240, 246. Judge Roberts determined that "it doesn't seem like there's any surprise to anyone that the pointing a firearm was going to be at issue today," and "[e]veryone knew this charge was pending," so the charge proceeded to trial. *Id*. at 241, 244.

Based on the record before us, we see no error with the prosecution of the pointing a firearm charge. Granted, there was some confusion as to why Judge Biddlecome appeared to have stricken the charge, and if he possessed the authority to do so *sua sponte*. However, neither Dewald nor the State ever moved to dismiss the pointing a firearm charge; moreover, it was filed in Superior Court 1, and all the parties prepared to prosecute/defend the charge at trial. As the State concisely argues, "Given that Dewald was admittedly prepared to defend the never-dismissed, re-docketed charge, he cannot now show that he was prejudiced such

19

that his conviction must be reversed." *Appellee's Br*. at 25.  We agree and find no error in the prosecution and conviction of this charged offense.[9]

## V.	Sufficiency of the Evidence

Dewald claims the evidence was insufficient to convict him of criminal confinement, intimidation, pointing a firearm, and criminal recklessness, which all stemmed from the events of October 2007 between Dewald and Abel.  Our standard of review for sufficiency claims is well settled.  *Bunch v. State*, 937 N.E.2d 839, 849 (Ind. Ct. App. 2010), *trans. denied* (2011); *Brown v. State*, 790 N.E.2d 1061, 1063 (Ind. Ct. App. 2003).  It is the task of finders of fact, juries or judges, to determine in the first instance whether the evidence in a particular case adequately proves the elements of an offense.  *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004).  We do not reweigh evidence or assess the credibility of witnesses. *Bunch*, 937 N.E.2d at 849; *Woods v. State*, 768 N.E.2d 1024, 1027 (Ind. Ct. App. 2002). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict.  *Bunch*, 937 N.E.2d at 849.  We will affirm the conviction if there exists probative evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  *Id.*

### A.	Criminal Confinement

Dewald asserts that the evidence was not sufficient to convict him of criminal confinement.  A person who knowingly or intentionally: (1) confines another person without

---

[9] Dewald filed with this court a Verified Motion to Supplement Record on Appeal, which sought to supplement Appellant's Appendix with a certified copy of a memorandum from Judge Biddlecome, concerning his recollection of and conversations regarding the issue of the pointing a firearm charge.  The chronological case summary is the official record of the trial court, and "a trial court speaks through its docket." *Gibson v. State*, 910 N.E.2d 263, 267 (Ind. Ct. App. 2009).  We hereby deny Dewald's Motion to Supplement Record.

20

the other person's consent; or (2) removes another person, by fraud, enticement, force, or threat of force, from one place to another, commits Class D felony criminal confinement. Ind. Code § 35-42-3-3(a). However the offense is a Class C Felony if it is committed while using a vehicle. Ind. Code § 35-42-3-3(b)(1). To "confine" means "to substantially interfere with the liberty of a person." Ind. Code § 35-42-3-1. A person can be confined even if in his or her own automobile or home. *Pyle v. State*, 476 N.E.2d 124, 127 (Ind. 1985).

Here, the State charged Dewald with confining Abel, without his consent, by using a vehicle. At trial, the State sought to prove that Dewald confined Abel when, after following Abel as he drove between Goshen and Elkhart on the afternoon of October 25, 2007, Dewald at one point passed Abel so that his vehicle was in front of Abel's. Then, after proceeding through a green traffic light, Dewald stopped his vehicle, requiring Abel to stop his as well. Abel had a tree, a curb, and barriers to his right, oncoming traffic to his left, a car stopped behind him, and Dewald stopped in front of him. Dewald exited his vehicle and began walking toward Abel's vehicle, when he suddenly turned and returned to his car and left. From these facts, the State asserts that sufficient evidence establishes that Abel was confined. Dewald's argument is that the oncoming traffic and the car stopped behind Abel were fortuitous and therefore negates the "knowing" element of the offense of criminal confinement. We are not persuaded.

Dewald intentionally maneuvered his vehicle in front of Abel's, then arbitrarily stopped after proceeding through a green traffic light at an intersection, causing Abel to stop as well. Dewald was aware of the traffic conditions and structures present at the time and

21

location. We find that there was sufficient evidence from which the jury could find that Dewald knowingly restricted Abel's liberty.

### B. *Intimidation*

Dewald asserts that the evidence was insufficient to convict him of intimidation. To convict Dewald of intimidation as a Class C felony, the State had to prove that Dewald: (1) communicated; (2) a threat to commit a forcible felony; (3) with the intent that the other person engage in conduct against the other person's will; (4) while drawing or using a deadly weapon. Ind. Code § 35-45-2-1. The display of a firearm coupled with words or conduct that is reasonably likely to incite confrontation is sufficient to prove intimidation. *Johnson v. State*, 743 N.E.2d 755, 756 (Ind. 2001). Here, the State sought to prove that Dewald communicated a threat to Abel by showing him a handgun and that Dewald intended to force Abel, against his will, to stop his vehicle. Dewald's argument on appeal is that even if Dewald was trying to communicate something, the evidence did not establish that Dewald intended Abel to stop his vehicle or engage in other conduct against his will. We view this as an invitation to reweigh the evidence, which we cannot do. *Griffith v. State*, 898 N.E.2d 412, 418 (Ind. Ct. App. 2008).

The jury was presented with evidence that Dewald followed Abel between Goshen and Elkhart on U.S. 33 at a high rate of speed, at times very close to his bumper, and periodically waving a gun "left to right, right to left" at Abel. *Tr.* at 1431. Thereafter, once they reached town and after passing through an intersection, Dewald forced Abel to stop his vehicle. Looking at the totality of evidence, the jury was presented with sufficient evidence from which it could infer that Dewald had been attempting to intimidate Abel into stopping

22

his vehicle. We find no reversible error with regard to the sufficiency of the evidence to support the intimidation conviction.

## C. Pointing a Firearm

Dewald argues that the evidence was insufficient to convict him of pointing a firearm. Indiana Code section 35-47-4-3(b) provides that: A person who knowingly or intentionally points a firearm at another person commits a Class D felony. The purpose of the statute is to "'protect individuals from being placed in danger of death or bodily injury from the discharge of a firearm.'" *Brown*, 790 N.E.2d at 1063 (quoting *Armstrong v. State*, 742 N.E.2d 972, 976 (Ind. Ct. App. 2001)). On appeal, Dewald asserts that the evidence was not sufficient to convict him of the offense of pointing a firearm because he only waved, rather than directly pointed, the gun at Abel. A review of Indiana case law, however, reveals that direct pointing of the firearm is not required.

In *Brown*, this court upheld the defendant's convictions for pointing a firearm when he was alleged to have pointed and/or waved it at three occupants in a vehicle. 790 N.E.2d at 1066. The court noted that, even if the defendant only had waved it, "[b]y waving a firearm at individuals in the confined space of an automobile, Brown put each occupant at risk of injury[.]" *Id*. Also, in *Armstrong*, we affirmed a defendant's three separate convictions for pointing a firearm when the evidence showed that during a single incident he pointed it, separately, at three different people. 742 N.E.2d at 976-77. We recognized, but did not decide, the issue that would be presented if the defendant had engaged "in one continuous action of pointing a firearm, such as when a defendant waves a gun indiscriminately toward a crowd of people." 742 N.E.2d at 977 n.2.

23

Here, Dewald held up his firearm and waved it side-to-side as he drove at a high rate of speed right behind Abel's vehicle, intending that Abel see his gesturing with the gun. Then, when Abel reached his destination and parked his car, Dewald drove up next to him and similarly waved the handgun for up to ten seconds. We find that, under these circumstances, the State presented sufficient evidence to sustain Dewald's conviction for pointing a firearm at Abel.

## D. Criminal Recklessness

Dewald claims the evidence was insufficient to convict him of criminal recklessness. A person commits Class A misdemeanor criminal recklessness if he or she recklessly, knowingly, or intentionally performs an act, by use of a motor vehicle, that creates a substantial risk of bodily injury to another person. Ind. Code § 35-42-2-2(b), (c). A person engages in conduct recklessly if he engages in conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct. Ind. Code § 35-41-2-2(c).

Here, the charged criminal recklessness stemmed from Dewald's act, on October 25, 2007, of suddenly veering into Abel's lane of travel on U.S. 33 as he drove from Goshen to Elkhart. At that time, the highway was four lanes, two north and two south. Abel was in the outer lane, and Dewald moved into Abel's lane in front of him, causing Able to "hit the brakes" to avoid a collision. *Tr.* at 1439. In his brief, Dewald argues that lane change without signaling is common in congested areas, and, at most, his conduct might constitute civil negligence. However, consistent with our standard of review, we cannot reweigh the evidence, and we look to the evidence most favorable to the verdict and reasonable

24

inferences therefrom. *Woods*, 768 N.E.2d at 1027. The State presented sufficient evidence from which the jury could have inferred that Dewald acted not with inadvertence or because of an error in judgment, but, rather, with disregard for the potential harm that might result from his actions. We find no reversible error.[10]

## VI. Sentencing

The trial court sentenced Dewald to the following terms of imprisonment: eight years of imprisonment for his Class C criminal confinement conviction; eight years for his Class C felony intimidation conviction; three years for the Class D pointing a firearm conviction; and one year for the Class A misdemeanor criminal recklessness conviction, all to run concurrently to each other. For the two Class B felony conspiracy to commit aggravated battery convictions, the trial court sentenced Dewald to twenty years on Count I (regarding Britton) and twenty years with ten years suspended on Count II (regarding Abel), to run consecutively, for a combined thirty years. The trial court ordered the two conspiracy convictions to be served consecutively to the other four convictions, for a total of thirty-eight years. On appeal, Dewald asserts that the thirty-eight-year sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character, and he asks us to

---

[10] In his dissent, our colleague Judge Baker concludes that "Dewald's actions, including driving erratically, waving his gun and abruptly stopping his vehicle were 'so compressed in terms of time, place, singleness of purpose and continuity of purpose as to constitute a single transaction,'" and that Dewald should, therefore, be convicted only of a single crime—intimidation—under the continuing crime doctrine ("CCD").

"The [continuing crime doctrine] doctrine applies in those situations where a defendant is charged multiple times with one offense or when a defendant is charged with an offense and a lesser included offense." *Koch v. State*, 952 N.E.2d 359, 373 (Ind. Ct. App. 2011), *reh'g denied* (citing *Walker v. State*, 932 N.E.2d 733 (Ind. Ct. App. 2010). *See also Firestone v. State*, 838 N.E.2d 468 (Ind. Ct. App. 2005). Here, although Dewald's crimes all occurred in close physical and temporal proximity, Dewald was not charged with multiple counts of one offense or with an offense and a lesser included offense, but with three distinct offenses. As a result, we conclude that the CCD does not apply.

revise it under Indiana Appellate Rule 7(B). Because we vacated one of Dewald's convictions for conspiracy to commit aggravated battery, and its sentence of twenty years with ten years suspended, we now examine whether the remaining aggregate twenty-eight-year sentence is inappropriate.

When reviewing a sentence imposed by the trial court, we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). We have authority to "revise sentences when certain broad conditions are satisfied." *Neale v. State,* 826 N.E.2d 635, 639 (Ind. 2005). We must examine both the nature of the offense and the defendant's character. *Drakulich*, 877 N.E.2d at 535. When conducting this inquiry, we may look to any factors appearing in the record. *Id*.

Appellate Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, but we still must give due consideration to that decision. *Coleman v. State*, 952 N.E.2d 377, 383 (Ind. Ct. App. 2011) (citing *Rutherford v. State,* 866 N.E.2d 867, 873 (Ind. Ct. App. 2007)). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Id*.

Our Supreme Court has explained that the principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Id.* at 382 (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). Our job on appeal "'should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence

26

on any individual count.'" *Id*. The defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate. *Id*. at 384.

We first examine the nature of the offenses. The State aptly describes that on October 27, 2007, Dewald engaged "in a game of cat-and-mouse on a public highway," at times waving a firearm back and forth, thereby placing not only Abel in danger, but also the traveling public. *Appellee's Br*. at 32. We further agree with the State that the later conspiracy offenses, arguably more serious in nature, were "well-thought out designs" and "not simply momentary lapses in judgment." *Id*. Specifically, in the weeks before their March 6 meeting, Dewald had told Bronson, an acclaimed martial arts expert who was known to have been in the business of inflicting physical harm, about problems that he was having with people including his bail bonding competitor, Abel. Then, on March 6, Dewald requested and received a meeting with Bronson, where he arranged and made partial payment for Bronson and his assistant(s) to severely beat Abel and Britton to the point that hospitalization would be required. He provided Bronson with "dossiers" of information that he had prepared about Abel and Britton to facilitate the job. Some days later, on March 10, Dewald confirmed what he wanted done to Abel and Britton. Dewald concedes in his brief that "[t]here is no minimizing the seriousness of the charges, especially the Class B felonies." *Appellant's Br*. at 27.

Turning to the character of the offender, Dewald argues that he was sentenced to the maximum on the conspiracies and the Class C and Class D felonies, and the maximum should be reserved for the worst offenders, of which he is not one, "given his mental and emotional state"; he argues that his sentence "should be reduced accordingly." *Id*. at 29. His

27

argument concerning his emotional and mental state is premised on the two-hour sentencing hearing, where Dewald extensively spoke about the lack of support for his convictions in *Dewald I* and attacked the court of appeals' findings that upheld the prior convictions. On appeal, he asserts that his commentary at the sentencing hearing "show[s] that Dewald was suffering from a very real perception of being persecuted by those he attempted to strike back against, albeit inappropriately and unlawfully." *Id.* at 28.

Contrary to Dewald's assertion, he did not receive the type of sentence reserved for the worst of offenders; he could have been sentenced to a maximum of sixty years, and he originally only received thirty-eight. The record before us reveals a character that lacked respect for the criminal justice system. Dewald was out on bond when he committed the current offenses. He hatched a vindictive scheme to hire "professionals" to severely beat a local deputy prosecuting attorney, as well as a bonding competitor. Throughout sentencing, he alleged that an ongoing fraudulent scheme, relating to bond forfeitures, was occurring in an Elkhart Superior Court. He showed no remorse and, in fact, exhibited an attitude that he was a victim of the system. His mental stability was evaluated by experts prior to trial, and ultimately he was determined competent to stand trial. There was no evidence presented during trial establishing or even suggesting that mental illness contributed to the crimes for which he was on trial.

Dewald has not established that the nature of his offense or his character warrants a reduction of the aggregate twenty-eight-year sentence. We thus affirm Dewald's sentences for Count I and Counts III, IV, V, and VI. We remand with instructions to vacate Dewald's conviction of and sentence for Count II and resentence him in accordance with this opinion.

Affirmed in part, reversed in part, and remanded with instructions.

BROWN, J., concurs.

BAKER, J., concurs in part and dissents in part with separate opinion.

**IN THE**

# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BART A. DEWALD, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1010-CR-541 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**BAKER, Judge, concurring in part and dissenting in part,**

I respectfully part ways with a portion of the majority's analysis and conclusion. Specifically, while I agree with the majority that there was one agreement involving two victims, I think that insofar as Dewald's acts constituted the same continuous offense of intimidation, the continuing crime doctrine requires us to vacate Dewald's convictions for criminal confinement, pointing a firearm, and criminal recklessness.

The continuing crime doctrine provides that "actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." Buchanan v. State, 913 N.E.2d 712, 720 (Ind. Ct. App. 2009). The continuous crime doctrine does not seek to reconcile the

30

double jeopardy implications of two distinct chargeable crimes. Riehle v. State, 823 N.E.2d 287, 296 (Ind. Ct. App. 2005). Instead, the doctrine defines those instances where a defendant's conduct amounts only to a single chargeable crime. Id.

In this case, at approximately 12:30 p.m., Abel left Goshen to visit his attorney in Elkhart, which is about a twenty minute drive. Abel was on U.S. 33 when he noticed Dewald's vehicle approaching at a high rate of speed. Dewald was within one to two feet of Abel's rear bumper, and he waved his gun at Abel. As they approached the city limits of Elkhart, Abel was in the passing lane when Dewald came along side Abel's car and began to veer into Abel's lane. Abel had to brake forcefully to avoid a collision or being pushed into oncoming traffic.

As Abel and Dewald approached Elkhart, U.S. 33 narrowed to two lanes and Dewald maneuvered his vehicle so that he was driving in front of Abel. Immediately after crossing through an intersection, Dewald stopped his vehicle, forcing Abel and the vehicle behind him to stop. Dewald exited his vehicle and walked towards Abel, who was boxed in by Dewald's vehicle, oncoming traffic, the vehicle behind him and a curb. Dewald then retreated to his vehicle. When Abel parked his vehicle at his attorney's office a short time later, Dewald pulled alongside him and waved his gun for up to ten seconds before pulling away.

Dewald's actions, including driving erratically, waving his gun, and abruptly stopping his vehicle were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction," namely, intimidation. Buchanan, 913 N.E.2d at 720. Accordingly, I would vacate Dewald's convictions for criminal confinement, pointing a firearm, and criminal recklessness.

31