Richard DRAKULICH, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A05–0612–CR–690.

Court of Appeals of Indiana.

Dec. 12, 2007.

Elizabeth A. Gabig, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issues

Following a jury trial, Richard Drakulich appeals his convictions of five counts of conspiracy to commit sale of unregistered securities, all Class C felonies, and six counts of conspiracy to commit securities fraud, all Class C felonies. He argues first that the convictions are not supported by sufficient evidence, and second that the multiple conspiracy convictions violate Indiana's "one conspiracy, one conviction" rule. Drakulich also appeals his aggregate sentence of nine years, with five years suspended, arguing first that it is improper as the trial court's finding of aggravating circumstances violated *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and second that the sentence is inappropriate given the nature of the offenses and his character. Concluding that sufficient evidence exists to support his convictions and that the multiple convictions do not violate the "one conspiracy, one conviction" rule, we affirm Drakulich's convictions. Concluding that any error in the finding of aggravating circumstances was harmless and that his sentence is not inappropriate, we also affirm his sentence.

### Facts and Procedural History

Sometime around 1994, David Proctor and Casimir Szpunar formed an estate planning company, Golden Age Financial ("GAF"), which assisted clients by selling insurance and annuities, setting up revocable lifetime trusts, and otherwise structuring their estates. At some point during

the period of 1994 to 1996, Proctor and Szpunar associated themselves with Great Midwest Technology ("GMT"), which had been formed by Larry Hunt to raise capital and develop his patented process of improving the energy output of poor-quality coal. Proctor and Szpunar agreed to sell GMT promissory notes to their estate planning clients during the spring of 1996, and continued to do so through the end of the year. They ceased selling these notes when Robert Webster, GMT's chairman of the board, expressed his concern regarding the practice's legality.

Proctor and Szpunar also associated themselves with John Grounds in the summer of 1996. Grounds had the idea of forming a business called Realfinder, which would allow prospective buyers and sellers of real estate to advertise and search for properties via the internet, thereby avoiding real estate agents and their fees.

In August, 1996, Proctor and Szpunar arranged a meeting in Effingham, Illinois, with Drakulich to discuss insurance matters related to GAF. However, during this meeting, Proctor and Szpunar's involvement with GMT came up, and Drakulich mentioned the possibility that he could secure funding for GMT from Morgan Weinstein & Co. ("Morgan"), a lending company based in California. Proctor and Szupnar shared the results of this meeting with Grounds, who also became interested in securing funding through Drakulich. In September 1996, Proctor, Szupnar, Grounds, and a company called Teton, joined together and incorporated as Realfinder. Realfinder also eventually enlisted Drakulich's services in hopes of securing funding through Morgan. Drakulich contacted Morgan, which eventually mailed Drakulich a letter with a preliminary funding agreement under which Realfinder would receive $100,000,000. No money

ever arrived from Morgan, which turned out to be a shell company and part of a lending scam.

Near the end of 1996, Drakulich, Proctor, Szpunar, and Grounds formed Uterground for the principal purpose of purchasing GMT from Hunt, who the others feared could hinder GMT's chances for funding because of his felony conviction for tax evasion. Drakulich admits he was heavily involved with Uterground. Although Drakulich characterizes his involvement with Realfinder as "minimal," Appellant's Brief at 8 (citing Proctor's testimony that during the period of May through September of 2007, Drakulich was "doing minimal work related to Realfinder"), the two companies shared office space and Szpunar testified that Drakulich was a part owner of Realfinder. Also, Realfinder paid for a house used by Grounds and by Drakulich when he spent time in Indianapolis, for Drakulich, Proctor, and two others to go to China to promote GMT, and for promotional rings for Drakulich, Proctor, Szpunar, and Grounds. Proctor was not authorized to write checks on Realfinder's account for over five-thousand dollars without Drakulich's approval. According to Proctor's testimony, GMT and Realfinder "were operating as one." Tr. at 115.

When Drakulich determined that GMT or Uterground needed funding for operations, he would make a request to Proctor, who would in turn sell promissory notes for Realfinder. Szpunar drafted these notes, and Grounds signed them. Proctor continued to sell these notes through the summer of 1997. Proctor told investors that the notes were secured by property owned by Grounds's family. When selling these notes, Proctor failed to disclose his interest in Realfinder. Realfinder was not registered to sell securities, and these

notes were not in fact secured by any real estate.

On July 15, 1999, the State charged Drakulich with twenty-one felonies: ten counts of conspiracy to commit sale of an unregistered security, ten counts of conspiracy to commit securities fraud, and one count of corrupt business influence. These charges were based on the allegations that Drakulich had agreed with Proctor to sell Realfinder promissory notes and transfer assets from Realfinder to GMT. The State subsequently filed two motions to amend, resulting in Drakulich being charged with eight counts of conspiracy to commit sale of an unregistered security and eight counts of conspiracy to commit securities fraud. At some point prior to Drakulich's trial, he pled guilty in the United States District Court for the Southern District of Illinois to three counts of mail fraud,[1] four counts of wire fraud,[2] four counts of transportation of money taken by fraud,[3] and one count of securities fraud.[4] As a result of pleading guilty, Drakulich was sentenced to a total term of 151 months. He remained incarcerated up to his jury trial in this case, held on October 16 through October 18, 2006. Before the case was submitted to the jury, the trial court granted Drakulich's motion to dismiss three of the conspiracy counts. The jury found Drakulich guilty of five counts of conspiracy to commit sale of an unregistered security, six counts of conspiracy to commit securities fraud, and not guilty of the remaining two counts of conspiracy to commit sale of an unregistered security. On November 2, 2006, the trial court conducted a sentencing hearing. At the hearing, the trial court made the following comments:

There are a number of competing concerns going through my system right now; one is the proportionality argument because it really kind of makes a lot of sense.[[5]] The other is the number of victims, the age of the victims, the record however I don't think shows that Mr. Drakulich knew the age of the victims that Proctor and Szpunar were taking advantage of. We can say that he probably knew or should've known, but there's nothing in the record that takes us there. As I look at his age and their age, look at the complexity of this entire scheme, look at what happened to the others, my greatest desire is to make sure that he can't create any more victims.... At the time he was doing this offense, committing these acts, he was likely also committing the Federal acts, but at that time he had no prior criminal history; that's a big mitigating factor. On the Conspiracy to Commit Securities fraud Counts ... the sentence will be the presumptive.... And again the number of counts and the complexity of the scheme, the number of the overt acts, the number of victims and the complexity of the scheme are aggravating factors, balance out.... On the sale of Unregistered Securities Conspiracy ... I'm going to find that the aggravating factors outweigh the mitigating factors.

\* \* \*

The balancing here was the difficult part, and again my knowledge of this entire enterprise is confined to hearing

---

1. 18 U.S.C. § 1341.

2. 18 U.S.C. § 1343.

3. 18 U.S.C. § 2314.

4. 15 U.S.C. § 77q.

5. At the sentencing hearing, Drakulich's counsel argued that others involved in the case, including Proctor, Szpunar, Grounds, and Hunt, received either little or no jail time as a result of their participation in this enterprise.

the guilty plea of Szpunar and Proctor, being aware of the plea agreement they reached, hearing what the contributions of Hunt and Grounds was [sic], recognizing that they never got charged at all and recognizing that Mr. Drakulich was a latecomer to the entire enterprise. Not an innocent, don't get me wrong, but a latecomer. If the other four weren't failing at their own scheme they would've never brought Mr. Drakulich onboard.

Tr. at 848–50. The trial court then sentenced Drakulich to four years for each count of conspiracy to commit securities fraud, all to run concurrently, and five years for each count of conspiracy to sell unregistered securities, all to run concurrently to each other, but consecutively to the sentences for conspiracy to commit securities fraud. The trial court also ordered the five-year sentence suspended to probation, for an aggregate sentence of nine years with five years suspended. Finally, the trial court ordered that the aggregate sentence run consecutively to Drakulich's federal sentence. Drakulich now appeals.

### Discussion and Decision

#### I. Sufficiency of the Evidence

Our supreme court has recently summarized our standard of review when assessing claims of insufficient evidence.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder *could* find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146–47 (Ind.2007) (quotations and citations omitted) (emphasis in original).

"It is unlawful for any person to offer or sell any security in Indiana unless ... it is registered ... [or] the security or transaction is exempted ... [or] it is a federal covered security." Ind.Code § 23–2–1–3. Also,

> It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly, (1) to employ any device, scheme or artifice to defraud, or (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading, or (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Ind.Code § 23–2–1–12.

As the State proceeded under a theory of conspiracy, it was required to prove that Drakulich, with the intent to commit the underlying crimes, agreed with another person to commit the crimes, and that either he or the person with whom he made the agreement performed an overt act in furtherance of the agreement. Ind. Code § 35–41–5–2(a), (b); *Lawrence v. State*, 665 N.E.2d 589, 592 (Ind.Ct.App. 1996), *trans. denied*. The State is not required to present evidence of an express

agreement. *Simmons v. State,* 828 N.E.2d 449, 454 (Ind.Ct.App.2005). "It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to commit the offense." *Porter v. State,* 715 N.E.2d 868, 870–71 (Ind.1999) (quoting *Williams v. State,* 274 Ind. 94, 96, 409 N.E.2d 571, 573 (1980)). Such an agreement may be shown by either direct or circumstantial evidence, including the acts of the parties to the agreement. *Mullins v. State,* 523 N.E.2d 419, 424 (Ind.1988). "However, mere association with the co-conspirator, standing alone, is insufficient to support a conviction for conspiracy." *Porter,* 715 N.E.2d at 871.

■ Drakulich does not argue that no overt act occurred, but claims that insufficient evidence exists to support a finding that he agreed with Proctor to sell the securities. We disagree. Although there are certainly conflicts in the evidence, we may examine only that evidence supporting the verdict. Such evidence indicates: 1) Drakulich was a part-owner of Realfinder,[6] *see* tr. at 509; 2) neither Realfinder nor GMT had any source of funding other than the sale of the promissory notes, *id.* at 114, 274; 3) Drakulich had weekly meetings with Proctor discussing the financial status of the various companies, *id.* at 114; 4) Drakulich knew that Proctor and Szpunar were selling Realfinder promissory notes to raise money, *id.* at 231; 5) Drakulich directly asked Proctor to "go out and raise money," *id.* at 122; 6) that as a result of these requests, Proctor sold the promissory notes; and 7) Drakulich was aware of transfers from Realfinder to GMT and directed that such monies be used to pay salaries and for other various purposes, *id.*

at 520–21. Although Drakulich argues that this evidence indicates only that he requested funds, this evidence also indicates he made these requests with knowledge of the method in which these funds were raised. Following these requests, Proctor or Szpunar proceeded to sell the unregistered securities. *Cf. Wallace v. State,* 722 N.E.2d 910, 913 (Ind.Ct.App. 2000) (recognizing that an agreement may be inferred by the overt acts of parties made in furtherance of a criminal act). Based on this evidence, the jury could reasonably infer the existence of an implicit agreement between Drakulich, Proctor, and Szpunar to sell the promissory notes.

## II. The One Conspiracy, One Conviction Rule

■ When the State brings multiple charges of conspiracy, "the relevant inquiry is whether there existed more than one agreement to perform some illegal act or acts." *Perkins v. State,* 483 N.E.2d 1379, 1386 (Ind.1985). In Indiana, where evidence indicates that only one agreement took place, only one conspiracy conviction can stand. *Turnley v. State,* 725 N.E.2d 87, 89–90 (Ind.2000). The "one conspiracy, one conviction rule derives from the notion that the agreement is the criminal act, and therefore one agreement supports only one conspiracy, even if multiple crimes are the object of the agreement." *Thacker v. State,* 709 N.E.2d 3, 7 (Ind.1999). Thus, where multiple crimes are "committed pursuant to a single agreement," only one conviction for conspiracy can stand. *Turnley,* 725 N.E.2d at 90. However, when there are separate agreements, multiple convictions do not violate the one

---

**6.** Drakulich claims in his brief that he had no ownership in Realfinder, and points to Proctor's testimony supporting this contention. *See* Appellant's Br. at 18 (citing Proctor's testimony that Drakulich was not an owner of Realfinder, but merely a "funding arrangement," tr. at 212). However, we do not resolve such conflicts in the evidence, and examine only the evidence supporting the verdict.

conspiracy, one conviction rule. *Id.* at 91 (holding that the rule was not violated where defendant originally agreed to commit burglary and later agreed to murder burglary victim). Determining whether a defendant entered into one or several agreements involves consideration of several factors, including: "the nature of the criminal scheme, the common participants, the proximity in time, and the conspirator's involvement in each crime." *Saunders v. State*, 562 N.E.2d 729, 739 (Ind.Ct. App.1990), *aff'd in relevant part*, 584 N.E.2d 1087 (Ind.1992). Whether one or several conspiracies occurred is a question of fact for the jury. *Id.* Therefore, our task on appeal is to determine whether sufficient evidence exists to support a jury's finding of multiple agreements. *Id.*

■ The essence of the circumstances leading to the sale of the securities may be summarized by Proctor's testimony that there were "talks between [him] and [Drakulich] with regard to raising money for Realfinder," and "whenever there was a need for ongoing operations there would be a request for additional funds." Tr. at 89. In relation to the charges for conspiracy to sell an unregistered security, the jury found beyond a reasonable doubt that Drakulich agreed to sell an unregistered security on April 18, 1997; April 22, 1997; April 26, 1997; July 2, 1997; and September 3, 1997. Each of these sales involved a separate victim. The jury also found beyond a reasonable doubt that Drakulich agreed to commit securities fraud by selling these securities and then transferring assets from Realfinder (the basis for the convictions to commit securities fraud) on these same dates, as well as on August 25, 1997. The evidence introduced indicates that securities were sold and transfers

were made on or around these dates. Under these circumstances, we conclude the evidence is sufficient to support the jury's finding that multiple agreements occurred.

Each of the sales occurred on a separate date and at a separate location.[7] Therefore, the circumstances are distinguishable from those in *Mftari v. State*, 537 N.E.2d 469, 475 (Ind.1989), where the defendant and another person committed three burglaries in a hotel within one hour. Our supreme court held that these circumstances did not permit the reasonable inference that the defendant had entered into three separate agreements. *Id.* On the other hand, in *Saunders*, this court held that where a confidential informant asked the defendant for narcotics on three separate days, and each time the defendant agreed to supply the narcotics, sufficient evidence existed to support three conspiracy convictions. 562 N.E.2d at 739.

Based on the fact that the sales took place at different times and were made in response to Drakulich's requests to Proctor to raise money for Realfinder, the jury could have reasonably concluded that each sale was initiated by a separate request. That is, the jury could have found that each of Drakulich's requests did not necessarily contemplate the future illegal sale of securities or transfers from Realfinder and that a separate agreement was reached prior to each sale and transfer. *Cf. Turnley*, 725 N.E.2d at 91 (recognizing that the defendant's original agreement was limited to stealing money from the victim and did not involve killing the victim). The jury could have found that each agreement focused on a separate act to be perpetrated at a separate time against a separate victim. *Compare Perkins v. State*, 483 N.E.2d 1379, 1387 (Ind.1985) (finding only

---

**7.** Proctor testified that he and Szpunar went to the victims' homes to sell the securities. Tr. at 90.

one agreement where "both conspiracy counts center on the same act," and noting that "appellants were charged with conspiring to deliver the marijuana into the prison, not with selling the drugs to fellow inmates").

We recognize that the evidence could support the alternative inference that there was a single agreement, followed by multiple acts all made under that agreement, but we make only those inferences supporting the verdicts. *See Drane*, 867 N.E.2d at 146–47. Pursuant to our standard of review, we are not at liberty to make our own inference, and must decide only if a reasonable fact-finder could have inferred multiple agreements. Given the evidence in the record, we cannot say that no reasonable fact-finder could find that there were multiple agreements, and therefore, the multiple conspiracy convictions are proper.

### III. Sentencing

### A. Trial Court's Finding of Aggravating Circumstances

■ As Drakulich committed the criminal acts for which he was convicted prior to our legislature's amendments to Indiana's sentencing scheme, the presumptive sentencing scheme applies to this case. *See Gutermuth v. State*, 868 N.E.2d 427, 431 n. 4 (Ind.2007). The Supreme Court's holding in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), applies to this sentencing scheme. *Smylie v. State*, 823 N.E.2d 679, 683 (Ind. 2005), *cert. denied*, 546 U.S. 976, 126 S.Ct. 545, 163 L.Ed.2d 459 (2005). Under *Blakely*, any aggravating circumstance used to enhance a defendant's sentence beyond the presumptive, excepting prior convictions, must either be found by a jury or admitted by the defendant.[8] *See Trusley v. State*, 829 N.E.2d 923, 925 (Ind. 2005). Drakulich argues that the trial court in this case found aggravating circumstances that were neither found by a jury nor admitted by him, and then improperly enhanced his sentences for conspiracy to commit sale of an unregistered security[9] to five years, one year above the statutory presumptive sentence of four years.[10]

■ Drakulich claims that the trial court improperly found the number of victims, the number of overt acts, and the complexity of the scheme to be aggravating factors. Appellant's Brief at 28. Initially, the number of victims and number of overt acts were not improper considerations. The jury found Drakulich guilty of eleven different counts involving six different victims. Therefore, that Drakulich made eleven separate agreements and harmed six different victims were facts found by a jury, and therefore properly considered when ordering an enhanced sentence.

---

8. A defendant may also waive his or her *Blakely* rights pursuant to a guilty plea in which he or she consents to judicial fact-finding. *Strong v. State*, 820 N.E.2d 688, 690 (Ind.Ct.App.2005), *trans. denied*.

9. Drakulich correctly does not challenge the trial court's finding of aggravating circumstances with respect to his four-year presumptive sentences for conspiracy to commit securities fraud. *See Davidson v. State*, 849 N.E.2d 591, 594–95 (Ind.2006) (*"Blakely* does not prohibit a trial court from finding aggravating circumstances. What it does prohibit

is a trial court finding an aggravating circumstance and enhancing a sentence beyond the statutory maximum." (emphasis in original)).

10. We recognize that the trial court suspended this sentence in its entirety. However, Drakulich may still challenge this enhancement, as "[a] suspended sentence is one actually imposed but the execution of which is thereafter suspended." *Beck v. State*, 790 N.E.2d 520, 523 (Ind.Ct.App.2003) (Mattingly–May, J., concurring in result)

■ We also question whether the trial court actually found the complexity of the scheme to be an aggravating circumstance, instead of merely an additional comment on the jury-found facts: eleven agreements, six victims, six sales of unregistered securities, and five transfers of assets from Realfinder to GMT. Also, at the sentencing hearing, Drakulich's counsel discussed some of the general circumstances of the case. *Cf. Howell v. State,* 859 N.E.2d 677, 683–84 (Ind.Ct.App.2006) (considering defense counsel's argument at sentencing hearing in determining whether or not the defendant admitted certain facts), *trans. denied; Freeze v. State,* 827 N.E.2d 600, 603 (Ind.Ct.App.2005) (finding defendant to have admitted probation violation through his counsel's argument at the sentencing hearing). However, to the extent the trial court considered any additional facts relating to the scheme's complexity, such consideration did violate *Blakely.*

■ Even if the trial court did improperly consider the complexity of the scheme in enhancing Drakulich's sentence, "a sentence enhancement may be upheld if other valid aggravators exist." *Pickens v. State,* 767 N.E.2d 530, 535 (Ind.2002). When the trial court finds an improper aggravating circumstance, "we have the option to remand to the trial court for a clarification or new sentencing determination, to affirm the sentence if the error is harmless, or to reweigh the proper aggravating and mitigating circumstances independently at the appellate level." *Cotto v. State,* 829 N.E.2d 520, 525 (Ind.2005).

Without considering the complexity of the scheme, we are left with the number of victims weighed against Drakulich's lack of criminal history. We recognize that a lack of criminal history is traditionally considered a substantial mitigating circumstance. *See Sherwood v. State,* 749 N.E.2d 36, 40

(Ind.2001). However, as the trial court noted at the sentencing hearing, Drakulich was committing acts around this time for which he was convicted of federal crimes, thereby somewhat diminishing the significance of this mitigating circumstance. *See Roney v. State,* 872 N.E.2d 192, 207 (Ind. Ct.App.2007) (recognizing that "despite [the defendant's] minor criminal history, he was not leading a law-abiding life"), *trans. denied.* While the trial court mentioned the complexity of the scheme in passing, it seemed primarily concerned with the number of victims, and stated its "greatest desire is to make sure that he can't create any more victims." Tr. at 849. Under these circumstances, "we can say with confidence that the trial court would have imposed the same sentence if it considered only the proper aggravators." *Robertson v. State,* 871 N.E.2d 280, 287 (Ind.2007). We conclude that any error in finding the complexity of the scheme was harmless.

### B. Appropriateness of Drakulich's Sentence

■ When reviewing a sentence imposed by the trial court, we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). We have authority to "revise sentences when certain broad conditions are satisfied." *Neale v. State,* 826 N.E.2d 635, 639 (Ind.2005). We must examine both the nature of the offense and the defendant's character. *See Payton v. State,* 818 N.E.2d 493, 498 (Ind. Ct.App.2004), *trans. denied.* When conducting this inquiry, we may look to any factors appearing in the record. *Roney,* 872 N.E.2d at 206.

In regard to the nature of the offenses, the record indicates that over a period of

several months, Drakulich agreed with his associates to extract a large amount of money from at least six elderly people seeking to plan their estate by selling them unregistered securities. After selling these notes, Drakulich further agreed to transfer the proceeds of these illegal sales to a separate company. Given these circumstances, we cannot say an aggregate sentence of nine years, with five years suspended is inappropriate.

In regard to Drakulich's character, as stated above, his lack of criminal history is tempered by the fact that he was clearly not living a law-abiding life for a period of time. The nature of the offense also comments negatively on Drakulich's character, as he either knew or should have known the situation of the people who were buying these bonds. Although we have seen far more checkered characters, Drakulich's lack of criminal history does not render inappropriate a sentence, for eleven felony convictions, of four years executed and five years suspended.

### Conclusion

We conclude sufficient evidence supports Drakulich's multiple conspiracy convictions and that his sentence is neither improper nor inappropriate.

Affirmed.

KIRSCH, J., and BARNES, J., concur.