**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**J. EDWARD BARCE**
Kentland, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

FILED
Nov 20 2012, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOHN R. NORTHERN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 56A03-1202-CR-62 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE NEWTON SUPERIOR COURT
The Honorable Daniel J. Molter, Judge
Cause No. 56D01-1104-FA-2

November 20, 2012

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, John R. Northern ("Northern") was convicted of dealing in methamphetamine[1] as a Class A felony and conspiracy to deal in methamphetamine[2] as a Class A felony. He appeals, raising the following three restated issues:

I.      Whether the trial court abused its discretion when it admitted witness testimony that Northern had been seen manufacturing methamphetamine prior to the date he was arrested;

II.     Whether the evidence was sufficient to support Northern's convictions for manufacturing and conspiracy to manufacture methamphetamine; and

III.    Whether Northern's thirty-year sentence with ten years suspended was inappropriate based on the nature of the offense and the character of the offender.

We affirm.

## FACTS AND PROCEDURAL HISTORY

At approximately 9:50 p.m. on April 9, 2011 Kentland Town Marshall Vincent Lowe ("Lowe") was on patrol in Kentland, Indiana. He noticed that the storage shed ("the shed") located on the property of Newton Village apartments was open, when normally it was closed. Newton Village consists of six apartments and is a government-subsidized housing facility for adults with disabilities.

Lowe approached the shed, which was eight feet by ten feet in size and located about twelve to fifteen feet from the apartment building, and he looked inside using his flashlight. He saw a folding camp chair, a marijuana "one hitter box" and some marijuana cigarette

---

[1] *See* Ind. Code § 35-48-4-1.1(a)(1)(A), (b)(3)(B)(iii).

[2] *See* Ind. Code §35-48-4-1.1, 35-41-5-2. Northern was also found guilty of possession of precursors, Indiana Code Section 35-48-4-14.5, but that conviction was vacated on the State's motion.

2

butts on it. *Tr.* at 25. Lowe then contacted the Newton County Prosecutor and requested a search warrant. Lowe secured the scene and, while waiting for the warrant, Northern and his then-girlfriend,[3] Jessica Ramirez ("Ramirez"), rode up to the shed on a motor scooter driven by Northern, intending to park the scooter inside the shed. Lowe and Northern spoke briefly, then Northern and Ramirez went into their apartment, number 101, and closed the blinds.

Upon receipt of the search warrant, Lowe initiated a search of the shed. He observed certain items such as ice melt salt, coffee filters, and a "water filter" device, which he believed to be consistent with the manufacture of methamphetamine. *Id.* at 28. Therefore, he contacted the Indiana State Police ("ISP") "meth team." *Id.* at 29. ISP Trooper Brock Russell ("Trooper Russell"), along with ISP Master Trooper Tim Kendall, responded to Lowe's call for assistance and arrived at the scene at approximately 3:00 or 4:00 a.m.

In the meantime, around midnight, Mary Hollingsworth ("Hollingsworth"), who managed the property, was called to the scene. Hollingsworth did not reside at Newton Village, but made weekly visits there to verify that it was in good repair, and her duties included enforcement of the "house rules" and ensuring residents enjoyed "peaceful enjoyment" of the residence. *Id.* at 146-47. She also was responsible for the certification of the government-subsidized property. Hollingsworth, upon arriving at the scene, expressed to police that, although she recognized some items in the shed, she did not recognize most of the contents. She observed, "[I]t was almost as if the whole area had been created into a man cave." Instead of seeing construction materials that had been in there, Hollingsworth

---

[3] Northern and Ramirez married in May 2011. *Supp. App.* at 53; *Tr.* at 132.

observed "a carpet on the floor, a lawn chair, an end table, a TV, and [] chairs kind of around the area." *Id*. at 156. Hollingsworth explained to police that she had given Northern and Ramirez permission to store some items in the shed.

Upon their arrival at the scene, ISP Troopers initially performed a site assessment for danger and then documented a number of items in the shed, including: a plastic DuPont container with a pinkish chunky substance at the bottom, which Trooper Russell recognized through his experience to be a "reaction vessel" used in the manufacture of methamphetamine. *Id*. at 75-76; *State's Exs*. 3, 8, 9. The container had a copper fitting that had turned blue, which indicated to Trooper Russell that anhydrous ammonia, an ingredient used in the manufacturing of methamphetamine, had passed through it. *Tr*. at 91, 115. Police found lithium batteries, a package of coffee filters next to a plastic funnel, a bag of ice melt salt, a Coleman bag that contained an electric pump, a turkey baster, and pieces of aquarium plastic tubing. *Id*. at 100-08; *State's Exs*. 9, 10. They also discovered a yellow gasoline or kerosene can, a two-liter Pepsi plastic bottle with holes drilled in the lid, electrical tape, a measuring cup, vice grip, and scissors. *Id.*

After investigation, the State charged Northern with three counts: (1) Class A felony dealing in methamphetamine by manufacturing it within 1,000 feet of a family housing complex; (2) Class A felony conspiracy to deal in methamphetamine within 1,000 feet of a family housing complex by assembling and maintaining apparatus and by initiating manufacture of methamphetamine; and (3) Class C felony possession of precursors.

At the jury trial, Trooper Russell testified to the typical process of manufacturing

4

methamphetamine and the manner in which the various devices are used. *Id*. at 81-87, 95. Although no methamphetamine was discovered in the shed or its contents, Sarah Wildeman, a forensic drug chemist with the ISP laboratory, testified that the pink sludge material at the bottom of the DuPont container was tested and contained ephedrine or pseudoephedrine. *Id*. at 124. Based on his experience with responding to and disassembling methamphetamine labs, Trooper Russell believed that "meth was made" in the shed at some point. *Id*. at 118.

Hollingsworth testified that originally the shed only housed landscaping and excess construction materials for Newton Village, but that, at some point, Ramirez had asked for and received permission from Hollingsworth to store in the shed a large TV and her grandmother's dining room chairs. Later, Ramirez had asked Hollingsworth to store her kids' bicycles in the shed, and Northern added to the conversation that their car was not operating and his only transportation was his moped, which would not start in cold temperatures, and they asked Hollingsworth permission to park it in the shed. Although reluctant, Hollingsworth relented and permitted the storage of the items, in particular the moped, because it was their only form of transportation to obtain groceries and other necessary items, and considering that Ramirez had two children to care for, Hollingsworth felt that she "had a moral responsibility" to not leave them without transportation. *Id*. at 152. Hollingsworth gave the one shed key to Northern in October or November 2010, on the condition that he make a copy and return it to her, which he never did, despite her repeated requests for its return.

When Hollingsworth arrived at the scene on the night in question, she noticed that a

5

second lock had been placed on the shed doors, and it was not put there by her. It was a brass lock, and she testified at trial that she had seen that lock previously, as it was placed on the bedroom door in Ramirez and Northern's shared apartment when she had visited it for an inspection (required for the subsidized housing). When asked at trial whether she purchased the ice melt, she stated that she did; however, she did not place it in the shed because she had no access to the shed. She stored it in the foyer area of the apartment building(s) or, when out of season, the janitor's closet. Hollingsworth testified that, not only did she not put the salt in the shed, she did not place in the shed, nor authorize anyone else to do so, the following: batteries; gas can; pop bottles and lid with holes; Coleman storage bag; coffee filters; funnel; gloves; scissors; turkey baster; measuring cup; DuPont water filter container; or folding camping chair.

Ramirez testified that, in 2011, she pleaded guilty to Class D felony possession of precursors, stemming from the items seized from the shed in April of that year. Pursuant to that plea she was required to testify truthfully against Northern at his trial. With regard to the precursors plea, Ramirez explained that she purchased Sudafed "at first [to] give it to people and get money for it," but then she "found out John Northern was using it to manufacture meth." *Tr*. at 136. Over Northern's Indiana Evidence Rule 404(b) objection, Ramirez testified that, in November or December 2010, she "would catch him doing things" with bottles and hoses and containers with liquid that led her to believe he was making methamphetamine. *Id*. at 138. She confirmed that Northern admitted to her that he was "making meth in the shed[.]" *Id*.

6

At the conclusion of the evidence, Northern moved for a directed verdict on all three counts, which the trial court denied. The jury convicted Northern as charged, but the State moved to vacate count three, possession of precursors, which the trial court granted. The trial court merged counts I and II, and following a sentencing hearing, imposed a sentence of thirty years, with ten years suspended, for an executed sentence of twenty years. Northern now appeals his convictions and sentence.

## DISCUSSION AND DECISION

### I. Admission of Ramirez's Testimony

Northern asserts that the trial court erred when it permitted Ramirez to testify about seeing Northern manufacturing methamphetamine in or around December 2010, arguing that it constituted improper evidence of uncharged misconduct in violation of Indiana Evidence Rule 404(b). The evidentiary rulings of a trial court are afforded great deference on appeal and are overturned only upon a showing of an abuse of discretion. *Willingham v. State*, 794 N.E.2d 1110, 1116 (Ind. Ct. App. 2003). A trial court's decision to admit evidence will not be reversed absent a showing of a manifest abuse of the trial court's discretion resulting in the denial of a fair trial. *Id.* Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State,* 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *trans. denied* (2000).

Here, Northern's counsel objected to Ramirez's testimony, asserting it violated Indiana Evidence Rule 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Rule 404(b) is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities." *Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997). Rule 404(b) evidence is not wholly precluded, however, and may be admissible for other purposes as noted in the rule. In such cases, the trial court must find that the Rule 404(b) evidence is relevant to an issue other than propensity and balance such evidence's probative value against its prejudicial effect under Indiana Evidence Rule 403. *Id.* Evidence of uncharged misconduct that is probative of the defendant's motive and "inextricably bound up" with the charged crime is properly admissible under Rule 404(b). *Willingham*, 794 N.E.2d at 1116 (citing *Sanders v. State,* 724 N.E.2d 1127, 1131 (Ind. Ct. App. 2000)). The rationale behind Rule 404(b) is that the jury is precluded from making the forbidden inference that the defendant had a criminal propensity and, therefore, engaged in the charged conduct. *Burgett v. State*, 758 N.E.2d 571, 579-80 (Ind. Ct. App. 2001), *trans. denied* (2002).

Northern asserts that Ramirez's observations of him manufacturing methamphetamine in December 2010 relate to a wholly different matter, characterizing it as prior uncharged misconduct, separate from "the 2011 case." *Appellant's Br*. at 12. The State maintains, however, that Ramirez did not testify about prior uncharged conduct or other "bad acts," but rather about the crimes charged in this case, because "[t]he date in the charging information reflects only when police found the methamphetamine lab, which Northern used to make

8

methamphetamine in November or December 2010." *Appellee's Br.* at 12. As the State reminds us, where time is not an element of the offense, or "of the essence of the offense," the State need not prove the precise date alleged in the information, and may prove that the crime occurred at any time within the statutory period of limitations. *Poe v. State*, 775 N.E.2d 681, 686-87 (Ind. Ct. App. 2002), *trans. denied*. In this case, the charging information alleged that "on or about April 10, 2011" Northern knowingly or intentionally manufactured methamphetamine and conspired to commit the felony of dealing in methamphetamine, both charged as Class A felonies. *Appellant's App.* at 42-43. Time is not an element of either crime charged and no statutory period of limitations is implicated.

Furthermore, although Northern attempts to separate the references to his manufacturing of methamphetamine in 2010, calling it separate from "the 2011 case," we find, as did the trial court, that Ramirez's testimony concerning her observations of Northern manufacturing methamphetamine, and his statements to her about it, was not evidence of prior bad acts as contemplated by Rule 404(b), but was evidence of the charged crime and illustrated that Northern had manufactured at the shed for an ongoing period of time. Specifically, Ramirez's testimony was that, in or around December 2010, she observed Northern doing things in the shed with hoses, bottles, and containers with liquid in them, which appeared to Ramirez to be manufacturing methamphetamine. She also said that Northern told her that he was manufacturing methamphetamine. Trooper Russell testified that items found in the shed, including the "reaction vessel" that contained pink sludge showing traces of pseudoephedrine, known as "pill dough," caused him to believe that "at

9

some point" there was lithium, ammonia, and pseudoephedrine in that reaction vessel and that based on his professional experience, "meth was made in that shed." *Tr*. at 118. Ramirez's testimony served to create a timeline, and the trial court did not abuse its discretion in admitting her testimony.

## II. Sufficiency of the Evidence

### A. *Dealing in Methamphetamine by Manufacturing*

Northern claims the evidence was not sufficient to sustain his conviction for dealing in methamphetamine by manufacturing it. When reviewing a claim of insufficient evidence, we consider only evidence that supports the verdict, and draw all reasonable inferences therefrom. *Bush v. State*, 772 N.E.2d 1020, 1022 (Ind. Ct. App. 2002), *trans. denied*. We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* We uphold a conviction if there is substantial evidence of probative value from which a jury could have found the defendant guilty beyond a reasonable doubt. *Id.* Circumstantial evidence alone is sufficient to sustain a conviction. *Id.*

Indiana Code section 35-48-4-2(a)(1) provides that a person is guilty of dealing in a schedule II controlled substance if he knowingly or intentionally manufactures methamphetamine. Northern's sufficiency argument is based on the fact that the police found no methamphetamine at the scene, and no evidence was found directly establishing that methamphetamine had been manufactured at the scene. However, Indiana Code section 35-48-1-18 does not require that the process be completed or that there actually be a final product before the statute applies. *Bush*, 772 N.E.2d at 1023.

10

Here, the evidence establishes that Northern possessed the only key to the shed and refused to give it back upon Hollingsworth's repeated requests. Thereafter, Northern or Ramirez, or both of them, placed on the shed door(s) a brass lock, which had been on their apartment bedroom door, thereby precluding an inspection by Hollingsworth. On April 10, 2011, ISP troopers found in the shed a number of items used in the manufacture of methamphetamine, including a DuPont "reaction vessel" container with a hose or tubing system at the top and pink "pill dough" sludge at the bottom. The pink sludge contained pseudoephedrine, a known ingredient of methamphetamine. The brass fitting on the reaction vessel had turned blue, indicating the presence at some point of anhydrous ammonia within the vessel. *Tr.* at 118. Also found were other known precursors involved in the manufacture of methamphetamine, including coffee filters, a plastic pop bottle with holes punched in the lid, lithium batteries, a turkey baster, more aquarium hosing, salt, a funnel, electrical tape, a measuring cup, and scissors. This evidence, combined with other testimony presented at trial, provided sufficient evidence from which the jury could conclude that Northern was guilty of dealing in methamphetamine by manufacturing.

### B. *Conspiracy to Deal in Methamphetamine*

Northern also argues that the evidence was not sufficient to sustain his conviction for conspiracy to deal in methamphetamine by manufacturing it. The crime of conspiracy to commit a felony has three elements: (1) an intent to commit a felony; (2) an agreement with another person to commit a felony; (3) and an overt act, performed by either the defendant or the other person with whom defendant had agreed, in furtherance of the agreement. Ind.

11

Code § 35-41-5-2. When establishing the existence of a conspiracy, the State is not required to prove the existence of a formal express agreement. *Dickenson v. State*, 835 N.E.2d 542, 552 (Ind. Ct. App. 2005), *trans. denied*. Although relationship and association with the alleged co-conspirator, standing alone, is insufficient to establish a conspiracy, an agreement can be inferred from circumstantial evidence, which may include the overt acts of one of the parties in furtherance of the criminal act. *Id*.

In this case, the State's charging information alleged the existence of an agreement between Northern and Ramirez to commit the crime of dealing in methamphetamine and that Northern committed the following overt act in furtherance: "assembled and maintained the apparatus or instrumentation and initiated the process of manufacturing methamphetamines." *Appellant's App*. at 43. Northern challenges the second element of the conspiracy offense, claiming that the State failed to prove the existence of an agreement between him and Ramirez to manufacture methamphetamine. In particular, Northern relies on the fact that Ramirez testified that she bought Sudafed to sell, then learned Northern was using it to manufacture methamphetamine, and that after Northern admitted to her that he was, in fact, making methamphetamine, they "got in a huge fight." *Tr*. at 144. This, Northern argues, establishes there was no agreement.

In reaching our decision today, we are mindful of our standard of review for a claim of insufficiency:

> [A]ppellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this

12

structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder *could* find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drakulich v. State*, 877 N.E.2d 525, 531 (Ind. Ct. App. 2007) (quoting *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007)), *trans. denied* (2008) (quotations and citations omitted) (emphasis in original).

In urging reversal, Northern relies on Ramirez's testimony that she and Northern "got in a huge fight" because he was manufacturing methamphetamine; this, Northern claims, conclusively establishes the lack of an agreement between the two of them. We disagree. First, the jury was free to discredit Ramirez's testimony that the two of them got in a fight about Northern manufacturing methamphetamine in the shed. Stated differently, the jury was not required to believe Ramirez. *Drakulich*, 877 N.E.2d at 531. Second, we must consider the probative evidence and reasonable inferences supporting the verdict. *Id.* Here, the record before us reflects that Ramirez testified to initially purchasing Sudafed to sell for money, but admits that Northern used it to manufacture methamphetamine. There was also evidence from which the jury could infer that, through Ramirez's efforts, Northern obtained increased and exclusive access to the shed. Initially, Ramirez asked for and was granted permission by Hollingsworth to store a television and some inherited chairs in the shed. At some point thereafter, Ramirez asked Hollingsworth if she could also store her kids' bicycles in the shed, but Hollingsworth refused because the shed was not their personal storage facility. "Shortly

13

following that attempt," Ramirez approached Hollingsworth and again asked to use the shed, explaining that she was purchasing a new bike for her son and really wanted to store it in the shed so it would not get stolen. *Tr.* at 151. In that conversation, "[Northern] interjected" that their car was not running and that his scooter was the only means of transportation, he needed to store it in the shed to keep it out of the cold temperatures. *Id.* at 151. Feeling a "moral responsibility" to Ramirez and her children, Hollingsworth relented and allowed Northern and Ramirez to use the shed for the scooter. *Id.* at 152. Then, in Ramirez's presence, Hollingsworth gave Northern her only key, which was in October or November 2010, on the condition that they make a copy and return the original to Hollingsworth. However, a key was never returned to her. She described:

> I [made] numerous, numerous attempts to get the key back. There was always an excuse. And the thing that was happening . . . [Northern] was never available to me. If I came to the building, essentially [he] would disappear; it was always [Ramirez] that I had to talk to. [She] could never come up with the key; [Northern] never gave me the key.

*Id.* at 153. From this, a jury could reasonably infer that Ramirez essentially "ran interference" between Hollingsworth and Northern at those times when Hollingsworth came looking for return of the shed key. *Appellee's Br.* at 17.

We must affirm the conviction unless no reasonable fact-finder could find that the State proved the elements of conspiracy to manufacture methamphetamine beyond a reasonable doubt. *Drakulich*, 877 N.E.2d at 531. We agree with Northern to the limited extent that the record does not reflect the existence of a formal express agreement; however, an agreement can be inferred from the circumstantial evidence. *Dickenson*, 835 N.E.2d at

14

552. After careful consideration of the record before us, we find sufficient evidence from which a jury could find that an agreement existed between Northern and Ramirez to manufacture methamphetamine.

### III.  Northern's Sentence

Northern contends that his twenty-year executed sentence is inappropriate in light of the nature of his offense and his character. "This court has authority to revise a sentence 'if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.'" Ind. Appellate Rule 7(B); *Boggs v. State*, 928 N.E.2d 855, 870 (Ind. Ct. App. 2010) (quoting *Spitler v. State*, 908 N.E.2d 694, 696 (Ind. Ct. App. 2009), *trans. denied*), *trans. denied*. Although Indiana Appellate Rule 7(B) does not required the reviewing court to be "extremely" deferential to the trial court's sentencing decision, we still must give due consideration to the trial court's sentence because we must understand and recognize the unique perspective a trial court brings to its sentencing decisions. *Boggs*, 928 N.E.2d at 870. The defendant bears the burden of persuading this court that the sentence imposed is inappropriate. *Id.*; *Serban v. State*, 959 N.E.2d 390, 393 (Ind. Ct. App. 2012).

Here, the trial court entered judgment of conviction on the two Class A felony convictions and merged them. During the sentencing hearing, the probation officer recommended thirty-five years of incarceration with eight years suspended. Ultimately, the trial court imposed the advisory thirty-year sentence and suspended ten years, which is less than that which probation recommended. *See* Ind. Code §35-50-2-4 (advisory sentence for

15

Class A felony is thirty years). In this appeal, Northern urges that, based on his character and the nature of the offense, the sentence is inappropriate in that it does not provide more suspended time or a placement in a community corrections program.

As to the nature of the offense, law enforcement found a significant amount of paraphernalia and precursors involved in the manufacture of methamphetamine in the shed, which was not Northern and Ramirez's personal storage facility, but was a shed meant only for storage of Newton Village construction and landscaping supplies. With the assistance of Ramirez, Northern manipulated Hollingsworth into giving her key to him, and he refused to return it. Furthermore, he or he and Ramirez installed an extra lock on the exterior of the shed, which according to Hollingsworth looked to be the same as the one he and Ramirez had installed on their bedroom door to prevent her regular inspection of it. Further, Trooper Russell noted the volatile nature of the substances used to manufacture methamphetamine, and Northern was involved in such manufacture just feet away from government-subsidized apartments that provided housing for adults with disabilities. Northern reminds us that his case "involved no sales or possession of methamphetamine." *Appellant's Br.* at 18. Given the other evidence in the record, however, he has not met his burden of proving that his sentence is inappropriate in light of the nature of the offense.

As to the character of the offender, Northern urges that he had a minor criminal history with no felonies, did not have a history of violence, and that his family required his assistance and support. With regard to his criminal history, the record before us reflects that Northern had five misdemeanor convictions between 2000 and 2010, including resisting law

16

enforcement, public intoxication, disorderly conduct, and two convictions for operating a vehicle while intoxicated. *Appellant's App*. at 241-42. Northern had been placed on probation once, for one of his operating while intoxicated offenses; however, two petitions for revocation of probation were filed for probation violations. *Id*. at 243. The Newton County probation officer who prepared the pre-sentence investigation report recognized that the current convictions reflected a "step up" in severity. *Id*. at 242. "'[A] record of arrests, particularly a lengthy one, may reveal that a defendant has not been deterred even after having been subject to the police authority of the State.'" *Boggs*, 928 N.E.2d at 870-71 (quoting *Cotto v. State,* 829 N.E.2d 520, 526 (Ind. 2005)). With regard to Northern's assertion that he was needed to support dependents, the record indicates that Northern has five biological children for whom he may have provided some degree of support at some prior time, but at the time of the offense, were supported by their mothers or adoptive parents. *Appellant's App*. at 241, 257. Northern's father testified that Northern was employed "most of the time," but explained that Northern jumped from one job to another because of a "terrible drinking problem" that "destroyed every job he had." *Id*. at 249, 251. . While Northern was not the worst offender and his crime was not the most heinous, his sentence was also not the most severe, and, in fact, less than that which the probation department recommended. Northern has failed to meet his burden of proving that his sentence is inappropriate in light of the nature of the offense or the character of the offender.

Affirmed.

NAJAM, J., and MAY, J., concur.